**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| MSPA CLAIMS 1, LLC, a Florida limited liability company, | CASE NO.: 1:18-cv-00157 |
| Plaintiff, | |
| v. | |
| TOWER HILL PRIME INSURANCE COMPANY, a Florida profit corporation; TOWER HILL CLAIMS SERVICE, LLC, a Florida limited liability company. | |
| Defendants. | |

**CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................1

II.   THE PARTIES ....................................................................................................3

    A.    Plaintiff .....................................................................................................3

    B.    Defendants ................................................................................................4

III.  JURISDICTION AND VENUE ..........................................................................5

IV.   STATUTORY FRAMEWORK AND PLAINTIFF'S ARTICLE III STANDING .....6

    A.    The Medicare Secondary Payer ("MSP") Provisions of the Medicare Act, 42 U.S.C. § 1395y *et seq.* ..............................................................6

    B.    Plaintiff's Article III Standing Pursuant to Its Assignment Agreement with Florida Healthcare Plus, Inc. ..........................................................8

        1.    Florida Healthcare Plus, Inc. – a Medicare Advantage HMO......................8

        2.    Initial Assignment Agreement between FHCP and La Ley Recovery .......9

        3.    La Ley Recovery Assigns its Rights of Recovery to Plaintiff MSPA Claims 1, LLC ..................................................................................10

        4.    Plaintiff's Class Representative Settlement Claim Relating to Medicare Part C Beneficiaries ...............................................................12

V.    FACTS RELEVANT TO ALL CAUSES OF ACTION ..............................18

    A.    Medicare Advantage Organizations.........................................................18

    B.    Primary Payer Reporting Requirements..................................................22

    C.    The Medicare Payment Process ..............................................................23

    D.    CMS's Standard for Storing Digital Health Insurance Claims Data......................24

    E.    Plaintiff's Use of EDI to Analyze Claims Data and Identify Reimbursement Claims Under the MSP Law ............................................28

VI.   CLASS ALLEGATIONS .................................................................................29

A.      Class Definition ......................................................................................29

B.      Numerosity...............................................................................................30

C.      Commonality............................................................................................31

D.      Typicality .................................................................................................31

E.      Adequacy of Representation....................................................................32

F.      Ascertainability .......................................................................................32

VII.   **CAUSES OF ACTION** ......................................................................................34

A.      Count I – Private Cause of Action for Violation of the MSP Act, 42 U.S.C. § 1395y(b)(3)(A)....................................................................................35

B.      Count II – Breach of Contract Pursuant to 42 C.F.R. § 411.24(e).......................36

VIII.  **DEMAND FOR JURY TRIAL** ..................................................................37

IX.    **PRAYER FOR RELIEF** .............................................................................38

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiff, MSPA CLAIMS 1, LLC, a Florida limited liability company, on behalf of itself and on behalf of other similarly situated entities, by and through undersigned counsel, and pursuant to Rule 23 of the Federal Rules of Civil Procedure, hereby brings this class action seeking relief from the Defendants, TOWER HILL PRIME INSURANCE COMPANY, a Florida profit corporation, and TOWER HILL CLAIMS SERVICE, LLC, a Florida limited liability company (collectively referred to as "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.     This is a class action lawsuit brought under 42 U.S.C. § 1395y, *et seq.*, otherwise known as the Medicare Secondary Payer ("MSP") Act or the MSP Law.  This action arises from the Defendants' systematic and uniform failure to reimburse conditional Medicare payments that should have been paid, in the first instance, by the Defendants, as primary payers, in accordance with 42 U.S.C. § 1395y(b)(8).[1]

2.     Plaintiff, MSPA CLAIMS 1, LLC ("Plaintiff" or "MSPA Claims 1"), brings this suit in its capacity as the assignee of Florida Healthcare Plus, Inc. ("FHCP"), a Health Maintenance Organization ("HMO") and participant in the Medicare Program pursuant to a Medicare Advantage ("MA") Plan.[2]  Plaintiff MSPA Claims 1 asserts the rights of FHCP to recover

---

[1] "A 'primary plan' is a group health plan, worker's compensation plan or law, automobile or other liability insurance policy or plan, no-fault insurance, or self-insured plan that has made or can reasonably be expected to make payment for an item or service." *Humana Medical Plan, Inc. v. Western Heritage Insurance Company*, 832 F.3d 1229, 1233 n. 1 (11th Cir. 2016) (citing 42 U.S.C. § 1395y(b)(2)(A)); *see also* 42 C.F.R. § 411.24(b).

[2] A Medicare Advantage or MA plan means health benefits coverage offered under a policy or contract by an MA organization that includes a specific set of health benefits offered at a uniform premium and uniform level of cost-sharing to all Medicare beneficiaries residing in the service area of the MA plan (or in individual segments of a service area, under §422.304(b)(2)). *See* 42

reimbursement of Medicare medical payments and benefits via a contractual assignment of all rights, title, and interest allowing it to bring these claims.  Plaintiff also brings these claims on behalf of similarly situated Medicare Advantage Organizations ("MAOs") and First Tier, Downstream and Related Entities ("FDR entities"),[3] including, Managed Service Organizations ("MSOs"), and Independent Physician Associations ("IPAs") (collectively referred to as "Class Members").

3.    Defendants have repeatedly failed to reimburse conditional payments made by Plaintiff's assignor and the Class Members on behalf of Medicare beneficiaries enrolled in Part C of the Medicare Act (the "Enrollees") for medical expenses resulting from injuries sustained in an accident (the "accident-related medical expenses"). The Enrollees were enrolled in MA Plans offered by Plaintiff's assignor and the Class Members.  Plaintiff's assignor and the Class Members suffered an injury in fact from Defendants' failure to reimburse, and accordingly, have standing to sue under 42 U.S.C. § 1395y(b)(3)(A) (the "MSP Private Cause of Action").

4.    Defendants have failed to fulfill its statutory duty upon entering into settlements with the Enrollees. Specifically, the Defendants have entered into settlement agreements with Medicare beneficiaries as a result of claims arising under liability insurance policies issued by the Defendants. Liability insurance plans are considered primary plans under 42 U.S.C. § 1395y(b)(2). Accordingly, the Defendants are primary payers and must reimburse Plaintiff and the putative

---

C.F.R. § 422.2.

[3] "First tier" entity means any party that enters into a written arrangement, acceptable to CMS, with an MA organization or applicant to provide administrative services or health care services for a Medicare eligible individual under the MA program. *See* 42 C.F.R. § 422.2.  "Downstream entity" means any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MA organization (or applicant) and a first tier entity. *Id*. These written arrangements continue down to the level of the ultimate provider of both health and administrative services. *Id*.

Class Members for their Medicare payments.

5.     Congress provided a private right of action to any private entity or individual to enforce the MSP Law and remedy a primary payer's failure to reimburse conditional payments made by original Medicare or an MA plan. As described in detail below, Plaintiff's assignor and the Class Members have each suffered an injury in fact as a result of the Defendants' failure to meet their statutory reimbursement obligations.

6.     On behalf of itself and the Class, Plaintiff seeks, *inter alia*: (1) double damages under the MSP Private Cause of Action for the Defendants' failure to properly reimburse conditional payments for Enrollees' medical expenses within the applicable limitations period; and (2) reimbursement, on a fee-for-service basis, for all sums that Plaintiff's assignor and the Class Members were billed for medical care and treatment rendered to the Enrollees for which the Defendants were responsible as primary payers.

7.     This lawsuit, like others, advances the interests of the MSP Law and Medicare, because when MA organizations recover conditional payments they "spend less on providing coverage for their enrollees" and the "Medicare Trust Fund . . . achieve[s] cost savings." *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 685 F.3d 353, 365 (3d Cir. 2012).

## II.    **THE PARTIES**

### A.    **Plaintiff**

8.     Plaintiff, MSPA Claims 1, LLC, is a Florida limited liability company, with its principal place of business located at 5000 S.W. 75th Avenue, Suite 400, Miami, Florida 33155.

9.     Numerous MAOs and FDR entities have assigned their recovery rights to assert the causes of action alleged in this complaint to Plaintiff. As part of those assignments, Plaintiff is empowered to recover reimbursement of Medicare payments made by its assignors that

should have been paid, in the first instance, by the Defendants.

10.     Plaintiff has been assigned all legal rights of recovery and reimbursement for health care services and Medicare benefits provided by MAOs and FDR entities that administer Medicare benefits for enrollees under Medicare Part C; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of conditional payments made by the assignor health plans, including the right to recover claims for health care services billed on a fee-for-service basis.

**B.     Defendants**

11.     Defendant, TOWER HILL PRIME INSURANCE COMPANY ("Tower Hill Prime"), is Florida profit corporation with its principal place of business located at 7201 N.W. 11th Place, Gainesville, Florida 32605.

12.     At all times material, Defendant, Tower Hill Prime, was and is authorized and licensed to transact insurance business and is currently transacting insurance business throughout the State of Florida, including, but not limited to, conducting business in Gainesville, Alachua County, Florida.

13.     Defendant, Tower Hill Prime, was and is one of the largest residential property insures in the State of Florida.  At all times material, Defendant, Tower Hill Prime, was and is engaged in the business of selling homeowners, landlord, condo, renters, and commercial property liability insurance, among other insurance policies, and has agents throughout Florida, including Alachua County.  As part of its business, Defendant, Tower Hill Prime, also issues general liability policies that contain no-fault medical payments ("Med Pay") coverage.

14.     At all times material, Defendant, Tower Hill Prime, as a liability insurer, was and is a primary payer under the MSP Act. *See* 42 U.S.C. § 1395y(b)(2)(A)); 42 C.F.R. § 411.24(b).

- 4 -

15.     Defendant, TOWER HILL CLAIMS SERVICE, LLC ("Tower Hill Claims"), is a Florida limited liability company with its principal place of business located at 7201 N.W. 11th Place, Gainesville, Florida 32605.

16.     At all times material, Defendant, Tower Hill Claims, handles and processes liability insurance claims in the State of Florida for Defendant, Tower Hill Prime.

17.     At all times material, Defendants Tower Hill Prime and Tower Hill Claims, were and are Responsible Reporting Entities ("RRE") under Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (MMSEA) for purposes of 42 U.S.C. § 1395y(b)(8).[4]

## III.   JURISDICTION AND VENUE

18.     This Complaint was filed as an original action in this District.

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) based upon the federal claims asserted under the MSP Law, 42 U.S.C. § 1395y, *et seq*

---

[4]MMSEA Section 111 added mandatory reporting requirements with respect to Medicare beneficiaries who receive settlements, judgments, awards or other payment from liability insurance (including self-insurance), no-fault insurance, or workers' compensation, collectively referred to as Non-Group Health Plan (NGHP) or NGHP insurance.  The provisions for Liability Insurance, No-Fault Insurance, and Workers' Compensation found at 42 U.S.C. § 1395y(b)(8):

- Added reporting rules, but did not eliminate any previously existing Medicare Secondary Payer (MSP) statutory provisions or regulations
- Include penalties for noncompliance
- Define who must report, a responsible reporting entity (RRE), as "an applicable plan": "...[T]he term 'applicable plan' means the following laws, plans, or other arrangements, including the fiduciary or administrator for such law, plan, or arrangement: (i) Liability insurance (including self-insurance). (ii) No fault insurance. (iii) Workers' compensation laws or plans."
- Include what must be reported
- Specify the form and manner of reporting

*See* https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/Overview.html.

20.     This Court has personal jurisdiction over Defendants as Defendants are authorized and licensed to conduct business in the State of Florida, purposefully direct or directed their actions toward the State, some or all consented to be sued in the State by registering an agent for service of process, they consensually submitted to the jurisdiction of the State when obtaining a license to sell residential and commercial property liability insurance in the State, and because they have the requisite minimum contacts with the State necessary to constitutionally permit the Court to exercise jurisdiction. Additionally, the Defendants maintain and carry on systematic and continuous contacts in the Southern District of Florida, regularly transact business within this judicial district, and regularly avail themselves of the benefits in this judicial district.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District and each Defendant transacted affairs and conducted activity that gave rise to the claim of relief in this District. *See* 28 U.S.C. § 1391(b).

22.     All conditions precedent to this action have occurred, been performed, or have been waived, including meeting any purported threshold amount to the applicable.

## IV.    STATUTORY FRAMEWORK AND PLAINTIFF'S ARTICLE III STANDING

### A.    The Medicare Secondary Payer ("MSP") Provisions of the Medicare Act, 42 U.S.C. § 1395y *et seq*.

23.     Congress enacted the Medicare Act in 1965 to establish a health insurance program for the elderly and disabled.

24.     The Medicare Act consists of five parts: Part A, Part B, Part C, Part D, and Part E. Parts A and B create, describe, and regulate traditional fee-for-service, government-administered Medicare. *See* 42 U.S.C. §§ 1395c to 1395i–5; §§ 1395–j to 1395–w. Under Parts A and B,

Medicare provides hospital insurance and coverage for medically necessary outpatient and physician services. 42 U.S.C. § 1395w-21(a)(1)(A). These benefits are administered on a per-fee basis, meaning Medicare pays for a beneficiary's medical needs as they arise. The United States Centers for Medicare & Medicaid Services ("CMS") provides coverage under Parts A & B. Part C outlines the Medicare Advantage program wherein Medicare beneficiaries may elect to use private insurers, *i.e*., MAOs, paid for by the United States, to provide Medicare benefits. 42 U.S.C. §§ 1395w–21–29. Part D provides for prescription drug coverage for Medicare beneficiaries, and Part E contains various miscellaneous provisions.

25.     In 1980, Congress added the MSP provisions to the Medicare Act in an effort to contain rising costs. *Zinman v. Shalala*, 67 F.3d 841, 843 (9th Cir. 1995). "The MSP [provision] makes Medicare insurance secondary to any 'primary plan' obligated to pay a Medicare recipient's medical expenses, including a third-party tortfeasor's automobile insurance." *Parra v. PacifiCare of Ariz., Inc.*, 715 F.3d 1146, 1152 (9th Cir. 2013) (citing § 1395y(b)(2)(A)). Under the MSP provisions, Medicare is not supposed to pay medical expenses when payment has been made or can reasonably be expected to be made by a primary plan, such as a liability insurance plan. 42 U.S.C. § 1395y(b)(2)(A)(ii).

26.     If a primary plan "has not made or cannot reasonably be expected to make payment," Medicare is authorized to make a conditional payment. 42 U.S.C. § 1395y(b)(2)(B)(i). However, since Medicare remains the secondary payer, the primary plan must reimburse Medicare for the conditional payment "if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii).  This responsibility may be demonstrated by "a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability)

of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." *Id*.

27.    Section 1395y(b)(2)(B)(iii) of the MSP Act provides for a private cause of action by the United States for double damages against "any or all entities that are or were required or responsible" to make payment.  In addition to the right of action by the United States, Congress in 1986 established a "private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement)." 42 U.S.C. § 1395y(b)(3)(A).  "The private cause of action allows Medicare beneficiaries and healthcare providers to recover medical expenses from primary plans." *Parra*, 715 F.3d at 1152.

28.    Part C of the Medicare Act allows Medicare enrollees to obtain their Medicare benefits through private insurers (*i.e.*, MAOs), instead of receiving direct benefits from the government. 42 U.S.C. § 1395w-21(a).  A MAO may sue a primary plan under 1395y(b)(3)(A) of the MSP Act that fails to reimburse it for conditional payments made. *See Humana Medical Plan, Inc.*, 832 F.3d at 1238; *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 685 F.3d at 355.

**B.    Plaintiff's Article III Standing Pursuant to Its Assignment Agreement with Florida Healthcare Plus, Inc.**

**1.    Florida Healthcare Plus, Inc. – a Medicare Advantage HMO**

29.    At all times material, Plaintiff's assignor, FHCP, owned and operated a Medicare Advantage HMO plan ("MA HMO"), with its principal place of business located in Miami, Miami-Dade County, Florida.

30.    An MA HMO is a coordinated care plan that includes a network of providers that are under contract or arrangement with the organization to deliver the benefit package approved by CMS. *See* 42 C.F.R. § 422.4(a)(1)(i) – (iii).

31.     FHCP contracted with the Centers for Medicare & Medicaid Services ("CMS") to provide Medicare benefits to eligible members enrolled in FHCP's MA HMO plan under Part C of the Medicare Act. MA HMO plan members are referred to as "Enrollees" and FHCP served the needs of its Enrollees through its Medicare and managed care programs, delivered through its network of physicians and health care professionals.

32.     As an MA HMO, FHCP provided Medicare benefits to its Enrollees and participants pursuant to its "Evidence of Coverage", in compliance with CMS requirements and standards. All funds utilized to service the needs, and otherwise pay for medical services and supplies, of the Medicare beneficiaries enrolled in MA Plans come directly from the Medicare Trust Fund.

33.     At all times material, FHCP was a secondary payer pursuant to the MSP Act and its corresponding regulations. 42 U.S.C. §§ 1395w-22(a)(4).

34.     On or about December 10, 2014, FHCP went into receivership.  The Florida Department of Financial Services was appointed as the Receiver for FHCP ("the Department").

**2.     Initial Assignment Agreement between FHCP and La Ley Recovery**

35.     On April 15, 2014, prior to FHCP going into receivership, FHCP entered into an assignment agreement with La Ley Recovery Systems, Inc. ("LLR Agreement") (**Exhibit A**).

36.     Pursuant to the LLR Agreement, FHCP assigned all its rights of reimbursement, subrogation and recovery against any liable primary payer under the MSP Law to La Ley Recovery Systems, Inc., a Florida Corporation ("La Ley Recovery").

37.     The LLR Agreement provides that FHCP retains "La Ley Recovery as an independent contractor to recover costs already paid for and/or generate revenue on a fee for services provided and/or shift current expenses incurred" for FHCP's "insureds and/or members

that have been involved in accidents and/or have Workers Compensation claims and/or any other incident/accident or for medical services of any kind whereby" FHCP "may either bill for services or recovery for payment of medical services." *See* Ex. A at § 1.1.  The LLR Agreement states as follows:

> It is the intent of the parties to assist each other in the implementation of a system whereby Client [FHCP] and/or any entity it has contracted to recover, shift and/or bill on a fee for service for all medical services and/or medications, diagnostic test or any amount it is obligated to pay to/or on behalf of any member or other liability that can be legally collected directly through an assignment of any kind and/or through Medicare and/or Medicaid rights and/or by State and/or Federal statute of any kind and/or any other right of any nature whatsoever that exists now or in the future. **By way of this agreement, Client [FHCP] appoints, directs and otherwise assigns all of Client's [FHCP's] rights as it pertains to the rights pursuant to any plan, State or Federal statute whatsoever directly and/or indirectly for any its members and/or plan participants. The parties agree that any rights conferred to Client [FHCP] by Medicare Advantage plans either by statute, contract and/or any other reason whatsoever will be administered by La Ley Recovery**...

*Id.* (emphasis added).

38.    The LLR Agreement also has a provision discussing litigation costs. It states, in pertinent part:

> Costs include, but are not limited to, filing fees, expert witness fees, deposition fees, witness fees, court reporter fees, long distance telephone charges, photocopy charges, etc. La Ley Recovery, will pay these costs up front, however, once there is a settlement and/or judgment amount, then the La Ley Recovery, may retain and deduct its costs advanced herein provided...

*Id.* at § 1.5. II. Accordingly, these terms sufficiently demonstrate an intent by FHCP to transfer claims under the MSP provisions to La Ley Recovery.

### 3.    La Ley Recovery Assigns its Rights of Recovery to Plaintiff MSPA Claims 1, LLC

39.    On February 20, 2015, La Ley Recovery assigned its claims from FHCP under the LLR Agreement to Plaintiff MSPA Claims 1 (the "MSPA Assignment") (**Exhibit B**).

40.    Pursuant to the MSPA Assignment, La Ley Recovery, as assignor, irrevocably assigned, transferred, conveyed and delivered to Plaintiff MSPA Claims 1, as assignee, all of La Ley Recovery's right, title, ownership and interests it had in the LLR Agreement.  *See* Ex. B at 1.

41.    The LLR Agreement required that any subsequent assignee must be approved by FHCP. *See* Ex. A at § 1.2 ("La Ley Recovery may assign the Agreement in whole or in part but the assignee must be approved by the Client."). FHCP accepted, acknowledged, approved, and consented to any subsequent assignment from La Ley Recovery to any then-existing or future MSP Company, which includes Plaintiff MSPA Claims 1. Moreover, the MSPA Assignment was subsequently approved by the Department, as FHCP's receiver.

42.    Specifically, on June 1, 2016, the Department executed a settlement agreement between FHCP and La Ley Recovery Systems, Inc., La Ley Recovery Systems – FHCP, Inc., MSP Recovery LLC, MSP Recovery LLC, MSP Recovery Services, LLC, and Plaintiff MSPA Claims 1 ("Settlement Agreement") (**Exhibit C**).

43.    The Settlement Agreement refers to the LLR Agreement stating: "on April 15, 2014, La Ley entered into a Cost Recovery Agreement with" FHCP under which FHCP "assigned all rights, title and interest held by FHCP to certain recoveries related to accidents or incidents recoverable pursuant to the" MSP Provisions and other state/federal laws. *See* Ex. C at 1. The Settlement Agreement refers to the LLR Agreement as the "Initial Agreement." It states:

> **Receiver acknowledges and agrees that the terms and conditions of the Initial Agreement**, to the extent such terms and conditions do not conflict with the terms and conditions of this Settlement Agreement, **shall remain in full force and effect from April 15, 2014** until the Effective Date of this Settlement Agreement... Receiver... expressly acknowledges and agrees that as of the execution of the Initial Agreement, all rights, title, and interest

held by FHCP to recoveries, including any rights, title and interest assigned to FHCP members, related to accidents or incidents recoverable pursuant to the Medicare Secondary Payer Act... **and all rights, title and interest to recover payments made by FHCP on behalf of FHCP members pursuant to various legal theories related to accidents or incidents recoverable pursuant to the Medicare Secondary Payer Act... were and continue to be irrevocably assigned to La Ley**.

*Id.* at § 2.a. (emphasis added).

44.     The Settlement Agreement also approved the subsequent MSPA Assignment: "the Assigned Claims may be assigned by and among any of the companies collectively referred herein as "La Ley," and the Receiver acknowledges that any assignment of the rights described hereunder by or among those companies collectively referred to as "La Ley" occurring prior to the execution of this Settlement Agreement shall be valid and enforceable." *Id.* at § 20. "La Ley" as used throughout the Settlement Agreement referred to La Ley Recovery, MSPA Claims 1, LLC, MSP Recovery LLC, and MSP Recovery Services, LLC. *Id.* at 1.

45.     The LLR Agreement, MSPA Assignment, and Settlement Agreement, sufficiently demonstrate that Plaintiff MSPA Claims 1 holds a valid assignment.

### 4.     Plaintiff's Class Representative Claim Relating to Medicare Part C Beneficiaries

46.     Plaintiff MSPA Claims 1 is the class representative of a class that consists of MA entities, including MAOs and FDR entities, including, but not limited to, HMOs, MSOs, IPAs, and other Medicare downstream entities and their assignees.  Accordingly, Plaintiff sets forth below an example of the Defendants' systematic and uniform failure to fulfill its statutory duties when entering into settlements with Medicare beneficiaries. In this example, Plaintiff describes the Defendants' failure to reimburse conditional payments and how that failure caused an injury in fact to FHCP, an MA HMO plan, which subsequently assigned its recovery rights to Plaintiff MSPA Claims 1.

47.     On or about March 22, 2012, D.L., a Medicare Part C beneficiary, was enrolled in the MA HMO plan issued and administered by FHCP.[5]

48.     On March 22, 2012, D.L. suffered bodily injuries when she was attacked and bitten by her neighbor's dog (the "accident"), which caused her to slip and fall resulting in further injuries.

49.     At all times material, Defendant, Tower Hill Prime, issued a homeowner's liability insurance policy, including no-fault Med Pay benefits, under Policy No. E001564835, to the owner of the property and third-party tortfeasor where the accident occurred.  A copy of the policy is not available to Plaintiff and is in the exclusive possession of the Defendant.

50.     As a direct and proximate result of the accident, D.L. sustained injuries which include, but are not limited to, the following:

      a.     E888.9 – Unspecified Accidental Fall;

      b.     917.9 – Other and Unspecified Superficial Injury of Foot and Toes Infected;

      c.     923.10 – Contusion of Forearm;

      d.     923.10 – Contusion of Elbow;

      e.     814.00 – Closed Fracture of Carpal Bone Unspecified;

      f.     843.9 – Sprain of Unspecified Site of Hip and Thigh; and

      g.     813.41 – Colle's Fracture Closed (of Unspecified Radius).

A list of the diagnostic codes and injuries assigned to D.L. in connection with D.L.'s accident-related medical care and treatment is attached hereto (**Exhibit D**).[6]

---

[5] In order to ensure that this document is compliant with the laws and regulations under HIPAA, the name of the Medicare Part C beneficiary has been truncated to the initials D.L.

[6] The data in Exhibit D was transferred from FHCP to La Ley Recovery pursuant to the LLR Agreement, and subsequently transferred to Plaintiff MSPA Claims 1 pursuant to the MSPA

51.     As a direct and proximate result of the accident, D.L. received medical services, treatment, and/or supplies for the injuries sustained in the accident and incurred reasonable expenses for said necessary medical care and treatment that were paid, in part, by FHCP.  The medical care and services rendered to D.L. include, but are not limited to, the following:

        a.      Emergency Room care;

        b.      Radiology services;

        c.      Orthopaedic services; and

        d.      Physical Therapy services.

An account of the medical care and services provided to D.L. as a result of the accident are included within Exhibit D.

52.     D.L.'s treating medical providers for the accident-related injuries include, but are not limited to, the following:

        a.      Jackson South Community Hospital (Date of Service: 3/22/2012);

        b.      Community Health of South Florida (Date of Service: 3/22/2012);

        c.      North Miami Beach Radiology (Date of Service: 3/23/2012); and

        d.      South Florida International Orthopaedics, P.A. (Date of Service: 3/29/2012).

*See* Ex. D.

53.     D.L.'s medical providers subsequently issued a bill for payment of the accident-related medical expenses to FHCP, which was fully responsible for all medical expenses incurred by D.L.   FHCP paid $8,146.09 for D.L.'s accident-related medical expenses. While Plaintiff alleges the amount paid solely for purposes of completeness, the medical providers actually billed

Assignment.

and charged FHCP $12,783.39 for D.L.'s accident-related medical expenses. The amount of damages recoverable under an MSP Act claim is what a MAO was charged, not what it ultimately paid. *See* 42 C.F.R. § 411.31. Accordingly, Plaintiff seeks double the amount of $12,783.39 as damages for this particular claim.

54.     Following D.L.'s claim against the Defendants' insureds, Defendants indemnified their insured tortfeasors and made payments pursuant to a settlement with D.L. relating to the accident. ("Tower Hill Settlement Agreement") (**Exhibit E**).  On June 22, 2012, D.L. and Tower Hill Prime, Tower Hill Claims, and their insureds, entered into the Tower Hill Settlement Agreement, which included a release of any and all claims "for both past and future losses, including medical expense, health care and related expenses." *See* Ex. E at 1.

55.     By entering into the Tower Hill Settlement Agreement and releasing all claims, Defendants became a primary payer and subject to liability for D.L.'s accident-related medical expenses. In fact, Defendants reported and admitted to CMS that it was the primary payer for D.L. (**Exhibit F –** *Defendants' MSP Reporting Relating to D.L. Settlement Claim*).[7]

56.     Further, Defendants even reported information regarding the accident, the name of the reporting entity, and the type of insurance policy involved. This reporting demonstrates that Defendants were aware of the accident and its responsibility to reimburse FHCP. A true and correct copy of Defendants' report to CMS is attached hereto (**Exhibit H** – *MyAbility Report*).[8]  Despite

---

[7] Plaintiff has identified at least 32 instances where Defendants, including their affiliated entities and/or subsidiaries, admitted they were to provide primary payment on behalf of Enrollees.  A list of such instances is attached hereto (**Exhibit G –** *Defendants' MSP Reporting*).

[8] Plaintiff obtained this reporting data from a vendor called MyAbility. MyAbility is one of 16 CMS-authorized vendors that allow companies, such as Plaintiff, to access data that primary payers report to CMS, in compliance with their statutory reporting obligations. To be clear, the reporting data attached to this Complaint is taken directly from the data that CMS stores, which is inputted by the Defendants, not the Plaintiff. Accordingly, any inaccuracies or lack of

Defendants' reporting that they were a primary payer, and the corresponding admission that they should have paid for D.L.'s accident- related injuries, Defendants failed to do so, giving rise to a claim under the MSP Act.

57.     Although not required by the MSP Act, the governing regulations, or interpretive case law, Plaintiff, on October 5, 2015, issued a Notice of Lien demand letter to Defendant, Tower Hill Prime, which provided Defendants access to the foregoing information regarding the D.L. claim and sought additional information related to reimbursements owed by Defendants to Plaintiff's assignors (**Exhibit I**).  On October 22, 2015, Defendant, Tower Hill Claims, responded to the Notice of Lien advising that the case had been settled prior to any notice of lien and a release had been secured (**Exhibit J**).

58.     On July 23, 2018, Plaintiff MSPA Claims 1 once again issued a demand letter to Defendants, Tower Hill Prime and Tower Hill Claims, pursuant to 42 C.F.R. § 411.25 (**Exhibit K**).

59.     As shown by the Plaintiff's Notice of Lien and 411.25 Letters and Defendants' own claims reporting, Defendants had actual and constructive knowledge that they were the primary payer for D.L. accident-related expenses.

60.     As of the filing of this class action complaint, the Defendants, Tower Hill Prime and Tower Hill Claims, have failed to reimburse Plaintiff and/or its assignor, FHCP, for the conditional Medicare payments FHCP made on behalf of D.L. for her accident-related medical care and treatment.

61.     Accordingly, Plaintiff MSPA Claims 1 is entitled to collect double damages against

---

specificity in the reporting data would be attributable to the manner in which Defendants chose to report.

the Defendants, Tower Hill Prime and Tower Hill Claims, for their failure to reimburse FHCP's conditional payment for D.L.'s accident-related expenses.

62.     Full details regarding the foregoing representative claim, i.e., specific payments, coverage determinations, etc., are immaterial to pleading an MSP Private Cause of Action but, in any event, are in Defendants' possession and will be located and assessed through the process of discovery. However, the allegations set forth herein plainly demonstrate a concrete example of how Plaintiff's assignor, FHCP, suffered damages as a direct result of Defendants' individual failures to reimburse conditional payments as required under the MSP Law.

63.     In addition, Section 1395y(a)(1)(A) of the Medicare statute states that, "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which … are not reasonable and necessary for the diagnosis or treatment of illness or injury."

64.     Because this Section contains an express condition of payment – that is, "no payment may be made" – it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary."

65.     Once an MA entity makes a payment for medical items and services on behalf of its Enrollees, the payment is conclusive proof that the items and services were reasonable and necessary.

66.     The items and services received by and paid on behalf of the Enrollees, including D.L., were reasonable and necessary.

67.     Based on the foregoing, Plaintiff MSPA Claims 1 has Article III standing to bring these claims and may pursue FHCP's rights, as a secondary payer, to recover conditional payments made on behalf of its Medicare Enrollees that should have been paid, in the first instance, by the Defendants.

## V.    FACTS RELEVANT TO ALL CAUSES OF ACTION

### A.    Medicare Advantage Organizations

68.    In 1997, Congress amended the Medicare Act and enacted Medicare Part C, now known as the Medicare Advantage program. 42 U.S.C. §§ 1395w-21 to w-28. "The congressional goal in creating the Medicare Part C option was to harness the power of private sector competition to stimulate experimentation and innovation to create a more efficient and less expensive Medicare system." D. Gary Reed, Medicare Advantage Misconceptions Abound, 27 Health Law 1, 3 (2014).

69.    MAOs enter into a contract with CMS to administer and provide the same benefits received under traditional Medicare.  42 U.S.C. §§ 1395w-21, 1395w-23.  Pursuant to this contract, MAOs receive a fixed payment from CMS for each enrollee. MAOs do not issue a Medicare "insurance policy" but, rather, send out a document describing the Medicare benefits that beneficiaries receive. They do not pay benefits pursuant to a 'policy', but rather under a statutory framework. Thus, MAOs pay healthcare providers directly for the care received by Part C beneficiaries.  If the costs of this care exceed the fixed payment received from the government, the MAO assumes the risk and cost.  However, if that care costs less than the fixed payment, the MAO keeps the difference as profit. Thus, MAOs are incentivized to provide health insurance more efficiently and focus on positive health outcomes in a way that traditional fee-for-service Medicare models are not. *See* H.R. Rep. No. 105–149, at 1251 (1997) (Part C allows "the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options.").

70.    To become a MAO, a private insurer must enter a bidding process, meeting certain requirements set by CMS. Additionally, in providing the basic benefits offered to traditional Medicare beneficiaries, MAOs must abide by coverage determinations provided by CMS and all

coverage disputes between beneficiaries and MAOs must go through the traditional Medicare appeals process. CMS sets the fixed rate at which MAOs will be remunerated per enrollee and establishes services the MAO must provide.

71.    An enrollee's health coverage with a MAO is strictly construed and regulated by CMS. For instance, CMS creates templates that MAOs must utilize when creating documents, including among others, the evidence of coverage ("EOC"), a document that describes in detail the health care benefits covered by the health plan. CMS requires that every evidence of coverage contain the following language:

> We have the right and responsibility to collect for covered Medicare services for which Medicare is not the primary payer. According to CMS regulations at 42 C.F.R. §§ 422.108 and 423.462, [insert 2017 plan name], as a Medicare Advantage Organization, will exercise the same rights of recovery that the Secretary exercises under CMS regulations in subparts B through D of part 411 of 42 C.F.R. and the rules established in this section supersede any State laws.

72.    The amount paid to the MAO is carefully calibrated, considering, such factors as the geographic location, age, disability status, gender, institutional status, and health status of *each* Medicare Advantage enrollee, so as to ensure actuarial equivalence with the traditional Medicare fee-for-service program option.  *See* 42 U.S.C. § 1395w-23(c).

73.    Currently, there are over 20 million individuals enrolled in Medicare Advantage plans nationwide. In Florida alone, there are more than 1.96 million individuals enrolled in Medicare Advantage plans.[9]

74.    The size and expense of the Medicare Advantage program makes it important that insurance companies, like Defendant, do not deflect their financial obligations under the MSP law

---

[9] *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Enrollment-by-State-Items/Monthly-Enrollment-by-State-2018-07.html?DLPage=1&DLEntries=10&DLSort=1&DLSortDir=descending

onto MAOs and ultimately onto the Medicare Trust Funds.

75.    Beneficiaries who receive their benefits through the traditional Medicare scheme and those who elect to receive their benefits through a MAO plan are all considered Medicare beneficiaries. Moreover, the MSP provisions apply with equal force to MAOs. Indeed, MAOs are specifically allowed to "exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations[.]" 42 C.F.R. § 422.108(f).

76.    The legislative history of the MSP provisions demonstrates that MAOs were intended to occupy a status analogous to that of traditional Medicare:

> Under original fee-for-service, the Federal government alone set the legislative requirements regarding reimbursement, covered providers, covered benefits and services, and mechanisms for resolving coverage disputes.  Therefore, the Conferees intend that this legislation provide a clear statement extending the same treatment to private [MA] plans providing Medicare benefits to Medicare beneficiaries.

*See* H.R. Rep. No. 105–217, at 638 (1997).

77.    Part C of the Medicare Act also contains the following important provisions:

> Notwithstanding any other provision of law, a Medicare+Choice organization [now known as an MA Plan] may (in the case of the provision of items and services to an individual under a Medicare+Choice plan under circumstances in which payment under this subchapter is made secondary pursuant to section 1395y(b)(2) of this title) charge or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy described in such section—
>
> (A)    the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or
>
> (B)    such individual to the extent that the individual has been paid
>
> under such law, plan, or policy for such services.

*See* 42 U.S.C. § 1395w–22(a)(4).

78.    Section 1395y(a)(1)(A) of the Medicare statute states that, "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which … are

not *reasonable* and *necessary* for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added).

79.    Because this Section contains an express condition of payment—that is, "no payment may be made"—it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary."

80.    Once a MAO makes a payment for medical items and services on behalf of its beneficiaries, the payment is conclusive proof that the items and services were reasonable and necessary.

81.    If a Medicare beneficiary or primary payer contests an MAO's right to reimbursement, the claim is construed as "arising under" the Medicare Act. Therefore, the time limitations for contesting whether a claim is reasonable or necessary under the Medicare Act applies.

82.    In this case, the Defendants failed to administratively appeal the FHCPs' right to reimbursement within the administrative remedies period on a class-wide basis. Defendants, therefore, are time-barred from challenging the propriety or amounts paid.

83.    Furthermore, the MSP provisions create a private cause of action against a primary plan when the primary payer fails to pay first or does not reimburse an MAO for its payment: "There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with [the requirements of the MSP Act]." 42 U.S.C. § 1395y(b)(3)(A). The provisions do not place any limitations on which private parties may bring suit.

84.    Further, Part C also includes a secondary payer provision that authorizes a MAO to

charge a primary payer for medical expenses paid on behalf of an Enrollee.  42 U.S.C. § 1395w-22(a)(4).  Consequently, MAOs that are injured as a result are empowered to recoup from the rightful primary payer if Medicare or a MAO pays for a service that fell within overlapping insurance coverage for a Medicare Part C beneficiary. *See* 42 C.F.R. § 422.108(f) (CMS regulations state that a "[MAO] will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter.); *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1355 (11th Cir. 2016) (holding that a MAO may assert claims under the MSP private cause of action under § 1395y(b)(3)(A), in order to recover conditional payments it made on behalf of its enrollees); *accord*, *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 685 F.3d at 356, 367.

### B.    Primary Payer Reporting Requirements

85.    In 2007, the Medicare Act was again amended to add the MMSEA Section 111 reporting requirements.  Part of those changes specifically aimed to help CMS and MAOs identify when a Medicare beneficiary was covered by a primary insurance payer.

86.    The 2007 amendments, therefore, created an affirmative duty on primary payers, such as the Defendants, to notify Medicare and MAOs when they should pay for medical expenses or be primary payers. Specifically, Responsible Reporting Entities ("RRE"), which include insurers like the Defendants, must determine whether their insureds are Medicare beneficiaries when they enter into settlement agreements with them. 42 U.S.C. §§ 1395y(b)(7)(A)(i) (RREs shall "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under" Medicare); 42 C.F.R. § 411.25.

87.    If an insured is a Medicare beneficiary, the RRE must electronically notify CMS of the accident and report the Medicare beneficiary's full name, Medicare Health Insurance Claim

Number ("HICN"), gender, date of birth, complete address, and phone number. 42 U.S.C. § 1395y(b)(7)(A)(ii). Then, when CMS or a MAO receives a medical claim for payment for that identified Medicare beneficiary/insured, the claim can be cross-checked against the notification database to determine whether there is a primary payer responsible for the medical claim. Anticipating the burden of the new reporting requirements, CMS developed a "query process" whereby an RRE can determine a claimant's Medicare status electronically and without authorization. RREs can electronically query whether a particular insured is a Medicare beneficiary and, if so, make sure to notify Medicare when that insured is in an accident that resulted in the provision of medical treatment.

88.     An insurance company's failure to comply with these reporting requirements results in a civil money penalty of up to $1,000.00 for each day of noncompliance with respect to each claimant.  42 U.S.C. § 1395y(b)(8)(E)(i).

89.     However, compliance with these reporting requirements does not absolve the primary payer of its obligation to pay first.  The reporting requirements are separate and apart from a primary payer's obligation to pay first under the MSP provisions. Reporting does not, itself, provide a safe harbor from making primary payments. It only avoids the imposition of civil penalties. If a primary payer was responsible to pay first, it must pay first regardless of conduct, intent, or even the primary payer's knowledge of a potential secondary payer. The obligation of a primary payer to pay first or reimburse CMS or MAOs is only discharged by making the payment.

C.     **The Medicare Payment Process**

90.     A MAO must process and pay or deny claims promptly to comply with the specific requirements established by federal law, federal regulations, and the terms of the its contract with CMS. Federal law requires Medicare and MAOs to pay within 30 days, 42 C.F.R. § 422.520(a),

for only those medical expenses that are reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A).

**D.     CMS' Standard for Storing Digital Health Insurance Claims Data**

91.     It is the custom and practice of CMS and primary plans to maintain records in a detailed electronic format.  According to the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").[10]

a.     The 837 standard is mandated by the Federal government and used by federal and state payors such as Medicare and Medicaid.

b.     The 837 standard is also used by private insurers, hospital clinics, physicians and other health care providers (i.e., HIPAA covered entities) who typically adopt CMS standards.

c.     Paper claims are captured in the CMS 1500, UB04, and UB92 forms, but electronically, the standard for storing data is the 837 format.

92.     Essential components of an 837-claim file include, but are not limited to, the date(s) of service, diagnosis code(s) and medical procedure code(s).

a.     <u>Dates (including dates of service)</u>: the standard format for dates in electronic health care claims is YYYYMMDD, CCYYMMDD, or MM/DD/YYYY.

(1)     According to industry best practices and guidelines, and to HHS and CMS, the standard format for expressing dates in healthcare insurance claims data is CCYYMMDD

---

[10] Department of Health and Human Services, Centers for Medicare and Medicaid. Medicare Billing: 837P and Form CMS 1500 (2016), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/837P-CMS-1500.pdf.

(CC representing two numeric digits to indicate Century, YY representing two numeric digits for year, MM representing two-digits for the month, DD representing two digits for the day of the month). Sometimes this is alternately expressed as YYYYMMDD.[11]

   (2) The CCYYMMDD date format standard has been in place for many years. *See* CMS Guidance for 2010,[12] 2011,[13] 2012,[14] 2013,[15] 2014,[16] and 2016.[17]

   (3) CMS has also accepted the MM/DD/YYYY format for its local coverage determination data. *See* Local Coverage Determination ("LCD") Date of Service

---

[11] *See* the Medicare Claims Processing Manual Chapter 3 and CMS Manual System, Pub 100-08 Medicare Program Integrity, Transmittal 721.

[12] CMS Manual System, Pub 100-20 One-Time Notification Transmittal 761 dated August 20, 2010, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R761otn.pdf

[13] CMS Manual System, Pub 100-20 One-Time Notification Transmittal 988 dated October 28, 2011, Business Requirements Table II, 7602.1 – Requirement, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R988OTN.pdf.

[14] CMS Manual System, Pub 100-20 One-Time Notification Transmittal 1050 dated February 29, 2012, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1050OTN.pdf.

[15] CMS Manual System, Pub 100-20 One-Time Notification Transmittal 1277 Medicare Physician Fee Schedule, dated August 9, 2013, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1277OTN.pdf.

[16] CMS Medicare Part D 2014 Guidance dated March 10, 2014, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/Part-D-Payment-Hospice-Final-2014-Guidance.pdf.

[17] Medicare Plan Payment Group Enterprise Systems Solutions Group Software Release Announcement, https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-February-2017-Software-Release.pdf.

Criteria.[18]

(4)     The purpose of the date format is to ensure that dates of health care claims such as the date a medical procedure was provided (date of service or DOS") in comparison to the date of settlement, can be searched, sorted and properly selected as compensable or non-compensable claims.

(5)     In general, ensuring the accuracy of dates, and other data is essential to performing analysis on claims data files by health insurers, and others who may need to determine the value of claims, the relevance of particular claims with respect to patient conditions, dates of care, or whether the claim is compensable.

b.     <u>Medical Diagnosis and Procedure Codes</u>:

(1)     Diagnosis-Related Group (DRG) – DRGs are a statistical system of classifying any inpatient stay into groups for the purposes of payment. The DRG classification system divides possible diagnoses into more than 20 major body systems and subdivides them into almost 500 groups for the purpose of Medicare reimbursement. Factors used to determine the DRG payment amount include the diagnosis involved as well as the hospital resources necessary to treat the condition.[19, 20]

---

[18] CMS.gov. Local Coverage Determination (LCD) Date of Service Criteria. https://www.cms.gov/medicare-coverage-database/search/lcd-date-search.aspx?DocID=L35093&bc=gAAAAAAAAAAAA.

[19] Gillian I. Russell, Terminology, in FUNDAMENTALS OF HEALTH LAW 1, 12 (American Health Lawyers Association 5th ed., 2011).

[20] Beginning in 2007, CMS overhauled the DRG system with the development of "severity-adjusted DRGs." Specifically, beginning in October 2007, CMS began to replace DRGs with "Medicare-severity DRGs" or "MS-DRGs" through a three-year phase-in period that blended payment under the old DRG system and the MS-DRG system. In a small number of MS-DRGs, classification is also based on the age, sex, and discharge status of the patient. The diagnosis and discharge information are reported by the hospital using codes from the ICD-9-CM or ICD-10 CM if the date of services is on or after October 1, 2015.

(2)    International Classification of Diseases (ICD-9 and ICD-10) The diagnosis information is reported by the hospital using codes from the ICD-9-CM (the International Classification of Diseases, 9th Edition, Clinical Modification if the date of services is before October 1, 2015), or ICD-10 CM if the date of services is on or after October 1, 2015.

(3)    Inpatient medical procedures ICD-9 Volume 2 and volume 3 and ICD-10 PCS. These codes are used to describe inpatient medical procedures, excluding the physician's bill.

(4)    Current Procedural Terminology ("CPT") – CPT[21] codes are a standardized listing of descriptive terms and identifying codes for reporting outpatient medical services and procedures as well as both inpatient and outpatient physician services. The current version, CPT-4 is maintained by the American Medical Association and is an accepted standard by the National Committee on Vital Statistics or NCVHS.[22]

(5)    Ambulatory Patient Classification (APC) - Services performed in outpatient ambulatory surgery centers may be classified by APCs.  CMS assigns individual services to APCs based on similar clinical characteristics and similar costs.[23]

---

[21] CPT codes and descriptions are copyrights of the American Medical Association Current Procedural Terminology.

[22] National Committee on Vital and Health Statistics, Consolidated Health Informatics Initiative, http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/.

[23] CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf.

(6)    Healthcare Common Procedure Coding System (HCPCS) - HCPCS is mainly used to indicate medical supplies, durable medical goods, ambulance services, and durable medical equipment, prosthetics, orthotics and supplies (DMEPOS).[24]

(7)    The standard Code set for medical diagnosis and procedure codes in health care claims is a series of digits as specified in 45 C.F.R. 162.1002 - Medical data code sets.

(8)    The purpose of standard diagnosis code sets is to use a universal terminology in describing patients with certain conditions to determine compensable or non-compensable claims.

93.    Specifically, CMS primarily utilizes two systems of classification: (1) the International Classification of Diseases ("ICD-9" or "ICD-10") medical diagnosis codes; and (2) Current Procedural Terminology ("CPT-4") procedure codes. *See* 45 C.F.R. 162.1002.

### E.    Plaintiff's Use of EDI to Analyze Claims Data and Identify Reimbursement Claims Under the MSP Act

94.    Using a software system (the "MSP System"), designed and developed by Plaintiff, Plaintiff can capture, compile, synthesize, and funnel large amounts of data to identify claims class-wide. The MSP System captures data from different sources to identify the Class Member enrollees' medical expenses incurred as a result of an accident and which should have been reimbursed for by Defendants after they entered into a settlement. The System can also identify the amounts owed, by using the Defendants' EDI, the MAO's data, and data acquired from outside sources, like CMS.

95.    Plaintiff merges the Defendants' data with the information available on the MSP

---

[24] American Academy of Professional Coders (AAPC), https://www.aapc.com/resources/medical-coding/hcpcs.aspx.

System to discover and identify a Medicare eligible person for whom reimbursement of secondary medical payments should have been made, along with any information stored as to potential class members.

96.    The MSP System utilizes ICD-9 or ICD-10 CM medical diagnosis codes and DRGs, ICD-9, ICD-10 PCS, HCPCS, or CPT procedure codes to identify and obtain any information regarding an Enrollee's claim, such as the type of injury suffered, the circumstances that caused the injury, whether the listed primary insurance provider made payment, and whether the insurance carrier was a liability provider.

## VI.    CLASS ALLEGATIONS

### A.    Class Definition

97.    Plaintiff MSPA Claims 1 brings this action on behalf of its assignor, FHCP, and on behalf of the following Class in accordance with Federal Rule of Civil Procedure 23(b)(3).  The putative class (hereinafter referred to as "Class Members") is defined as:

> All Medicare Advantage Organizations, First Tier, Downstream and Related entities, or their assignees, that provide benefits under Medicare Part C, in the United States of America and its territories, who made payments for a Medicare beneficiary's medical expenses where Defendant:
>
> (1)    is the primary payer by virtue of having settled a claim with a Medicare beneficiary enrolled in a Medicare Advantage plan;
>
> (2)    settled a dispute to pay for personal injuries with a Medicare beneficiary enrolled in a Medicare Advantage plan; and
>
> (3)    failed to reimburse Medicare Advantage Organizations, First Tier, Downstream and Related entities, or their assignees, the payments provided for medical items and services related to the claims settled by Defendant.
>
> This class definition excludes (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

98.     This matter is brought as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of all Class Members or their assignees that paid for their beneficiaries' medical expenses, when Defendants should have made those payments as primary payers and should have reimbursed the Class Members.

99.     As discussed in this class action complaint, Defendants have failed to provide primary payment and/or appropriately reimburse the Class Members for money they were statutorily required to pay under the MSP Law. This failure to reimburse applies to Plaintiff, as the rightful assignee of MAOs and related entities that assigned their recovery rights to Plaintiff, and to all Class Members. Class action law has long recognized that, when a company engages in conduct that has uniformly harmed a large number of claimants, class resolution is an effective tool to redress the harm.  This case, thus, is well suited for class-wide resolution.

100.    Class Members have been unlawfully burdened with paying for the medical costs of their beneficiaries when the law explicitly requires Defendants to make such payments. The Medicare Act and its subsequent amendments were constructed to ensure an efficient and cost-effective system of cooperation and communication between primary and secondary payers. Defendants' failure to reimburse Plaintiff and Class Members runs afoul of the Medicare Act and has directly contributed to the ever-increasing costs of the Medicare system.

101.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy shown as follows.

### B.      Numerosity

102.    Joinder of all members is impracticable.  Upon information and belief, there are hundreds of MAOs and related entities (including their assignees) throughout the United States,

which were not reimbursed by Defendants after they entered into a settlement with a Medicare beneficiary enrolled in a Medicare Advantage plan administered by a MAO or related entity. Thus, the numerosity element for class certification is met.

### C.    Commonality

103.    Questions of law and fact are common to all members of the Class. Specifically, Defendants' misconduct was directed at all Class Members, their affiliates, and those respective organizations that contracted with CMS and were identified as "secondary payers" by Medicare Part C. Defendants failed to make reimbursement payments, report the settlement it entered with Medicare beneficiaries, and ensure that Medicare remained a secondary payer, as a matter of course. Thus, all Class Members have common questions of fact and law, *i.e.*, whether Defendants failed to comport with its statutory duty to pay or reimburse Plaintiff's assignors pursuant to the MSP provisions. Each Class Member shares the same needed remedy, *i.e.*, reimbursement. Plaintiff seeks to enforce their own rights, as well as the reimbursement rights of the Class Members, for medical payments made on behalf of their Medicare Part C beneficiaries, as a result of Defendants' practice and course of conduct in failing to make primary payment or properly providing appropriate reimbursement.

### D.    Typicality

104.    Plaintiff's claims are typical of the Class Members' claims, as all have been damaged in the same manner. Plaintiff's and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, and share the same legal theory. As the putative class representative, Plaintiff possesses the same interests and suffered the same injury as the other Class Members, which demonstrates a legally sufficient nexus between Plaintiff's claims and the Class Members' claims. Plaintiff's claims are typical of the Class Members' claims because

Defendants failed to make primary payments for Enrollees' accident-related medical expenses, which it was obligated to do by virtue of their settlements with Enrollees. Plaintiff's claims are typical because Plaintiff, like the Class Members, have a right to relief for Defendants' failure to make primary payments, or reimburse Plaintiff and Class Members for conditional payments of the Enrollees' accident-related medical expenses. Plaintiff's and the Class Members' claims are based on the same statutes, regulations, legal theories and factual situations. Defendants' business practices, acts and omissions are materially the same with respect to Plaintiff's and the Class Members' claims, as will be Defendants' legal defenses. Plaintiff's claims are, therefore, typical of the Class.

### E.    Adequacy

105.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests in vindicating these claims are shared with all members of the Class and there are no conflicts between the named Plaintiff and the putative Class Members. In addition, Plaintiff is represented by counsel who are competent and experienced in class action litigation and also have no conflicts.

### F.    Ascertainability:

106.    Locating members of the Class would be relatively simple, since CMS maintains records of all MAOs, and providing notice to such entities could be accomplished by direct communication.

107.    The Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because a class action in this context is superior. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class. Defendants, whether deliberately or not, failed to make required payments under the MSP provisions and failed to reimburse Class Members and those organizations that assigned their

recovery rights to Plaintiff, thus depriving Plaintiff, as assignee of the right to recovery, and Class Members of their statutory right to payment and reimbursement.

108.    It is the custom and practice of CMS and primary plans to maintain records in a detailed electronic format. Based on these practices, Plaintiff maintain a reasonable methodology for generalized proof of Class-wide impact, using the MSP System designed and developed by Plaintiff and its counsel. The MSP System captures, compiles, synthesizes and analyzes large amounts of data in order to identify claims for reimbursement of conditional payments. This case will not present manageability problems as compared to non-electronic data driven class actions. There is no need for a fact-specific individual analysis of intent or causation, and damages will be calculated based upon the total fee-for-service amounts associated with the payments made on behalf of Enrollees. Plaintiff is capable of using the MSP System to identify and quantify Class Members' claims, as it has done for its own claims. Two other courts have recognized the MSP System as a viable method to prove damages in substantially similar cases wherein the plaintiff, like in this case, asserted an MSP private cause of action breach of contract causes of action. *MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins.*, 2017 WL 477124 (Fla. 11th Cir. Ct. 2017); *MSPA Claims 1, LLC v. IDS Property Cas. Ins. Co.*, Case No. 2015-27940 CA-01 (Fla. 11th Cir. Ct. 2017).

109.    Proceeding with a class is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia*, such treatment will allow a large number of similarly-situated entities to litigate their common claims simultaneously, efficiently, and without the undue duplications of effort, evidence, and expense that several individual actions would induce; individual joinder of the individual members is wholly impracticable; the economic damages suffered by the individual class members may be relatively modest compared to the

expense and burden of individual litigation; and the court system would benefit from a class action because individual litigation would overload court dockets and magnify the delay and expense to all parties. The class action device presents far fewer management difficulties and provides the benefit of comprehensive supervision by a single court with economies of scale.

110. Administering the proposed Class will be relatively simple. Defendants provided liability insurance policies with claimants who are also Medicare beneficiaries. Once that data identifying these policies is compiled and organized, Plaintiff can determine which of the policy holders were Medicare beneficiaries during the applicable time. Then, using the database, Plaintiff and the Class Members can identify those payments made for medical treatment where the Defendants were (1) the primary payer and (2) for which reimbursement was not made. Indeed, two Florida state classes were recently certified in *MSPA Claims 1, LLC v. Ocean Harbor Cas. Ins.*, 2017 WL 477124 (Fla. 11th Cir. Ct. 2017) and *MSPA Claims 1, LLC v. IDS Property Cas. Ins. Co.*, Case No. 15-27940-CA-21 (Fla. 11th Cir. Ct. 2017) using the same methodology.

## VII.    CAUSES OF ACTION

111. The basis for Plaintiff's claims is as a result of the Defendants' failure to pay or reimburse under which Medicare payments are secondary and reimbursable if any other insurer is liable.

112. Defendants are primary payers that should have paid for the same items and/or services that were paid or otherwise financially absorbed by Plaintiff's assignor. These items and services were incurred by the MAO and its in-network Medicare Part C providers as secondary payers because the primary payer should have paid for these items and/or services or should have otherwise reimbursed the secondary payer which are Plaintiff's assignors.

113. In addition to having been beneficiaries with the Class Members at the time of

accidents, Class Members' beneficiaries were also covered by a medical payments policy issued by Defendants.

114.    Defendants failed to appropriately reimburse the Class Members.

115.    Defendants issued medical payments policies and collected premiums.

116.    The Class Members advanced Medicare payments on behalf of their beneficiaries for medical treatment and supplies for which Defendants were responsible as primary payers. Defendants were primarily responsible by virtue of their contractual obligations to provide Medicare beneficiaries enrolled in a Medicare Advantage plan for their accident-related expenses. Class Members paid for the beneficiaries' Medicare Services when Defendants had the primary obligation to do so. Accordingly, Plaintiff seeks damages on behalf of themselves and similarly situated assignors and their assignees for Defendants' violation of the MSP provisions.

## COUNT I

### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)

117.    Plaintiff incorporates by reference paragraphs 1 – 116 of this Complaint.

118.    Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A) on behalf of itself and all similarly-situated parties.

119.    The elements of a cause of action under 42 U.S.C. § 1395y(b)(3)(A) are: (1) the defendant's status as a primary plan; (2) the defendant's failure to provide for primary payment or appropriate reimbursement; and (3) damages. *Humana Med. Plan, Inc.*, 832 F.3d at 1239.

120.    Defendants' liability insurance policy is a primary plan, which rendered the Defendants a primary payer for accident-related medical expenses.

121.    As part of providing Medicare benefits to Medicare beneficiaries enrolled under the Medicare Advantage program, the Plaintiff's assignors and putative Class Members paid for items

and services which were also covered by liability insurance policies issued by Defendants.

122.    Because the Defendants are primary payers, the Medicare payments for which Plaintiff seeks reimbursement were conditional payments under the MSP Law.

123.    Defendants were required to timely reimburse Plaintiff's assignors for their conditional payments of the Enrollees' accident-related medical expenses. *See* 42 U.S.C. § 1395y(b)(2)(ii); 42 C.F.R. § 411.22(b)(3); *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1355 (11th Cir. 2016). Defendants failed to do so.

124.    Plaintiff and the Class Members have suffered money damages as a direct result of Defendants' failure to reimburse the accident-related medical expenses.

125.    Defendants have derived substantial profits by placing the burden of financing medical treatments for their policy holders upon the shoulders of Plaintiff's assignors and the Class Members.

126.    In this case, Defendants failed to administratively appeal Plaintiff's assignor's right to reimbursement within the administrative remedies period on a class wide basis. Defendants, therefore, are time-barred from challenging the propriety or amounts paid.

127.    Plaintiff, for itself and on behalf of the Class, brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from Defendants for its failure to make appropriate and timely reimbursement of conditional payments for the Enrollees' accident-related medical expenses.

## **COUNT II**

### **Direct Right of Recovery Pursuant to 42 C.F.R. § 411.24(e) for Breach of Contract**

128.    Plaintiff incorporates by reference paragraphs 1 – 116 of this Complaint.

129.    42 C.F.R. § 411.24(e) effectuates a private cause of action under the MSP Law for

CMS and MAOs to recover conditional payments made from any primary payer.

130.    The Plaintiff's assignors are subrogated the right to recover primary payment from Defendants for Defendants' breach of contract with their insured, pursuant to the MSP provisions. Specifically, Defendants were contractually obligated to pay for medical items and services arising out of an accident, and Defendants failed to meet that obligation. This obligation was, instead, fulfilled by Plaintiff's assignors and the Class Members. Under the MSP provisions, Plaintiff is permitted to subrogate the Enrollee/insured's right of action against Defendant. See 42 C.F.R. § 411.26.

131.    Plaintiff complied with all conditions precedent to the institution of this action, to the extent applicable.

132.    Defendants failed and/or refused to make complete payments of the Enrollees' accident-related expenses as required by its contractual obligations.

133.    Defendants failed to pay each Enrollee's covered losses, and Defendants have no reasonable proof to establish that it was not responsible for the payment.

134.    Defendants' failure to pay the medical services and/or items damaged Plaintiff and the Class Members as set forth herein. Plaintiff and the Class Members processed medical expenses and are entitled to recover up to the statutory policy limits for each Enrollee's medical expenses related to the subject accidents, pursuant to their agreements with CMS and the provider of services.

## VIII.   DEMAND FOR JURY TRIAL

135.    Plaintiff MSPA Claims 1 and the putative Class Members, demand a trial by jury of all issues so triable as a matter of right.

## IX.    __PRAYER FOR RELIEF__

136.    WHEREFORE, Plaintiff MSPA Claims 1, LLC, individually, and on behalf of the

Class Members described herein, prays for the following relief:

a.    find that this action satisfies the prerequisites for maintenance of a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and certify the respective Class;

b.    designate Plaintiff as representative for the Class and Plaintiff's undersigned counsel as Class Counsel for the respective Class; and

c.    issue a judgment against Defendants that:

i.    grants Plaintiff and the Class Members a reimbursement of double damages for those monies the Class is entitled to under 42 U.S.C. § 1395y(b)(3)(A);

ii.    grants Plaintiff and the Class Members a reimbursement of damages for those moneys the Class is entitled to pursuant to their direct right of recovery for breach of contract within Count II;

iii.    grants Plaintiff and the Class Members pre-judgment and post-judgment interest consistent with the statute; and

iv.    grants Plaintiff and the Class Members such other and further relief as the Court deems just and proper under the circumstances.

DATED this 17th day of August, 2018.        Respectfully submitted,

**THE FERRARO LAW FIRM**

*/s/ James L. Ferraro*
James L. Ferraro, Esq.
Florida Bar No.: 381659
jlf@ferrarolaw.com
Janpaul Portal, Esq.
Florida Bar No.: 0567264
jpp@ferrarolaw.com
James L. Ferraro, Jr., Esq.
Florida Bar No.: 107494
jjr@ferrarolaw.com
serve@msprecovery.com
Brickell World Plaza
600 Brickell Avenue, 38th Floor

Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222

**AND**

**NAPOLI SHKOLNIK PLLC**

*/s/ Louise R. Caro*
Louise R. Caro, Esq.
Florida Bar No.: 633380
lcaro@napolilaw.com
2665 South Bayshore Drive, Suite 220
Coconut Grove, Florida 33133
Telephone (786) 837-5442
Facsimile (786) 800-3901