## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

MSPA CLAIMS 1, LLC, a Florida limited
  liability company,

                        Plaintiff,

v.

TOWER HILL PRIME INSURANCE
  COMPANY, a Florida profit corporation;
TOWER HILL CLAIMS SERVICE, LLC, a
  Florida limited liability company.

                   Defendants.

CASE NO.: 1:18-cv-00157 AW/GRJ

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
## AND MEMORANDUM OF LAW IN SUPPORT

Plaintiff, MSPA Claims 1, LLC ("Plaintiff"), moves this Court pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify this case as a class action, based on the facts and authorities set forth in the following memorandum of law, including the declarations of Daniel L. Regard, II and Michael F. Arrigo and the depositions of the parties' respective Rule 30(b)(6) corporate representatives, as well as the papers and records on file in this action, and on such other matters as may properly come before this Court.

## INTRODUCTION

Pursuant to the Medicare Secondary Payer Act, set forth in 42 U.S.C. § 1395y (the "MSP Act"), and well-established Eleventh Circuit precedent, a Medicare Advantage Organization ("MAO" or "MA plan") – like Medicare itself – is a secondary payer that can make conditional payments when primary plans fail to pay and can sue the primary plans that should pay, but don't. *MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.,* 950 F.3d 764, 768 (11th Cir. 2020); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1316 (11th Cir. 2019); *Humana Med. Plan, Inc. v. W. Heritage Ins. Co.*, 832 F.3d 1229, 1238-12399 (11th Cir. 2016). That is exactly what occurred in this case.

Accordingly, Plaintiff seeks to recover conditional payments it and the putative class members made on behalf of Medicare beneficiaries arising out of third-party bodily injury claims that were settled by Defendants, Tower Hill Prime Insurance Company ("TH Prime") and Tower Hill Claims Services, LLC ("TH Claims") (collectively, "Defendants"). Defendants have engaged in a standardized practice and course of conduct that ignores federal law requirements under the MSP Act. In doing so, Defendants have bilked Plaintiff and the putative class members by failing to pay substantial amounts of money they owe.

1

The evidence deduced thus far demonstrates that Defendants have a common practice and course of conduct of failing to: (1) pay first and/or (2) reimburse MAOs after they made conditional payments. Stated otherwise, Defendants have employed a uniform and common practice of burying their heads in the sand when it comes to identifying and reimbursing the subject MAO putative class members. In fact, Defendants' Supervisor of Liability Claims admitted that Defendants *do not* have any "written policy or procedure requiring adjusters to ask third party claimants whether they have any Medicare coverage through a Medicare Advantage plan" and "there are no policies or procedures in place at [Defendants] from January 2012 to the current date to identify and report claims to Medicare Advantage plans." *See* Deposition Transcript of Bob Jaye ("Bob Jaye Depo"), at 43:19-23; 74:15-21.

Moreover, even though part of Defendants' claim review and investigative process is to request and receive medical bills: (1) there is no process or protocol in place "whereby claims adjusters are required to review the medical bills themselves to determine and identify any potential payers, whether secondary payers, third party payers or anyone else that may be responsible"; and (2) Defendants do not have "any internal medical management team or medical management nurses that are tasked with reviewing the medical records to determin[e] relatedness and appropriateness of medical treatment." *Id*. at 116:25 – 117:7; 151:11-18; 173:8-12. Notably, Defendants have not conducted any independent medical examinations since the time their corporate representative has been with Defendants, *i.e.* 2002. *Id*. at 173:23 – 174:2.

The D.L. claim sets forth a typical example of Defendants' uniform and common course of conduct. Defendants requested medical records and bills from D.L., but only received medical records. Id. at 185:6-10. However, the absence of medical bills did not deter Defendants from settling with D.L. "in order to resolve the claim as soon as possible" and indemnifying the

policyholder. *Id.* at 189:23-190:1. At no point did Defendants take any steps to determine whether any payments had been made by D.L.'s MA plan for accident-related expenses. *Id. at* 190:2-18. In fact, the first time Defendants confirmed D.L.'s Medicare eligibility was ***after*** settling with D.L. in September 2012. *Id. at* 181:16-20, 190:11-18. Defendants' conduct for D.L.'s claim exemplifies its *de minimus* claims review process as well as its complete disregard for their obligation to determine whether Medicare or an MA plan may have made conditional payments subject to reimbursement.

Consequently, Plaintiff seeks to certify a class pursuant to Rule 23(b)(3) to address Defendants' violations of federal law and obtain recovery for themselves and the putative class members.  Plaintiff proposes certification of a "Settlement Class." The settlement class consists of MAOs that made payments on behalf of Medicare beneficiaries who were injured in an accident caused by Defendants' insureds and whose payments were not reimbursed after the Medicare beneficiaries' third-party bodily injury claims were settled by Defendants. The settlement class consists of all the instances where Defendants failed to reimburse the MAOs for accident-related medical expenses paid by the MAOs upon settling Medicare beneficiaries' injury claims.

As further corroborated by Plaintiff's data analytics and healthcare data experts, Plaintiff's Proposed Method for handling the putative class claims "when applied directly to the Defendants' data, would allow for greater matching capability than matching via CMS (using myABILITY) due to (a) enhanced matching techniques, (b) additional matching data fields, and (c) greater transparency to monitor and audit the process." *See* Report of Daniel L. Regard, II ("Regard Report"), ¶ 5, 148-174; *see also* Report of Michael Arrigo (Arrigo Report"), ¶¶ 1-9.  Mr. Regard further concluded "that that the data to execute the Proposed Method *exists*; that it is *easily accessible, and can be aggregated and presented on a class wide basis*; and that the method

proposed by the Plaintiff *may be universally applied* for all class members to identify liability and calculate damages."

In sum, certification is appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. 23(b)(3).

## BACKGROUND

### A.      Plaintiff's Private Cause of Action Under the MSP Act

The MSP Act "made private insurers 'primary' payers (pay first) and Medicare the 'secondary' payer (pay only if a balance is remaining)." *Tenet Fla., Inc.*, 918 F.3d at 1316. "Medicare can pay the entire amount upfront, so long as the primary plan eventually reimburses Medicare for any amounts it overpaid." *Id*. "[P]rimary payers can sometimes take a long time to pay (for instance, when a tort defendant or her insurer is contesting liability)," so Medicare steps in. *Id.* However, after a defendant agrees to settle an injured party's claim, the act of settlement demonstrates the defendant's responsibility as a primary plan, such that the MSP Act requires it to reimburse Medicare.  42 U.S.C. § 1395y(b)(2)(B)(ii); *Humana Med. Plan, Inc.*, 832 F.3d at 1239.

As in this case, a defendant becomes a primary payer by virtue of having settled a bodily injury claim with a Medicare beneficiary enrolled in an MA plan. *See* Order granting in part and denying in part Defendants' Motion to Dismiss, ECF No. 61, at 14 ("A primary plan's responsibility for payment can be 'demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.'")(citing *MSP Recovery, LLC v. Allstate Ins. Co.*, 835

F.3d 1351, 1361 (11th Cir. 2016). "To give the reimbursement requirement some teeth, the MSP Act created" a "second cause of action for private plaintiffs," such as Medicare Advantage Organizations ("MAOs"), which "stand in the shoes of Medicare." *Humana Med. Plan, Inc.*, 832 F.3d at 1239.

### B.    The Representative Claim – D.L.

On March 22, 2012, D.L. was a Medicare beneficiary enrolled in an MA HMO plan issued and administered by Florida Healthcare Plus ("FHCP")[1]. On the same day, D.L. suffered bodily injuries when the policyholder's dog knocked D.L. down, which caused her to fracture her wrist and sustain other injuries. *See* Bob Jaye Depo, 182:24-25. FHCP was billed $12,783.39 and paid approximately $8,146.09 for D.L.'s accident-related medical expenses. *See* ECF No 1-4.

At the time of the accident, TH Prime issued a homeowner's liability insurance policy, including no-fault Med Pay benefits, under Policy No. E001564835, to the owner of the property and third-party tortfeasor where the accident occurred. *See* Bob Jaye Depo,  185:15-25; 186:1-2. Defendants requested D.L.'s medical records and bills, but only received the medical records. *Id.* at   184:12-13; 185:9-10.[2] After receiving the medical records, Defendants' adjuster had a "reasonable expectation that the incurred medical bills, the out-of-pocket medical specials would exceed $5,000.00." *Id.* at   186:24-25; 187:1. Following D.L.'s claim against the Defendants' insureds, Defendants paid D.L. $5,000.00 in Med Pay benefits and entered into a third-party

---

[1] FHCP assigned its recovery rights to La Ley Recovery Systems, Inc., and subsequently validly assigned those rights to Plaintiff. *See Tenet Fla.*, 918 F.3d at 1319-1320. Accordingly, Plaintiff has standing to bring this suit under the MSP Act. *See* ECF No. 61, at 5-11.

[2] In fact, the medical records received by Tower Hill from D.L. include medical records from South Florida International Orthopaedics, P.A., which is one of the medical providers for which FHCP made conditional payments as a result of D.L.'s accident-related medical expenses. *See* ECF No.1-4; *see also See* Deposition Transcript of Natasha Blanco ("Natasha Blanco Depo"), at 69:21 – 70:2; 72:3-24; 75:13 – 76:20.

liability settlement agreement with D.L. to indemnify their insured tortfeasors relating to the accident for $25,000.00 on June 22, 2012. *Id.* at 186:3-5; ECF No. 1-5. D.L. and Defendants, and their insureds, entered into the settlement agreement, which included a release of any and all claims "for both past and future losses, including medical expense, health care and related expenses." ECF No. 1-5.  That settlement made Defendants the primary payers for D.L.'s accident-related expenses. *See* ECF No. 61, at 4.

The undisputed evidence in this case demonstrates that to date Defendants have refused to pay or reimburse Plaintiff and/or FHCP for the conditional payments made on behalf of D.L. despite admitting that they are primary payers by virtue of entering into a settlement of D.L.'s third-party bodily injury claim. *See* Bob Jaye Depo, 198:2-20.  Defendants admit that they "took no steps whatsoever to determine whether or not there was a Medicare Advantage secondary payer entitled to reimburse for conditional payments made on behalf of D.L." prior to tendering payment under the settlement agreement and MedPay portion. *Id.* at  190:2-11; 193:8-17.  Defendants' blatant disregard of their obligations under the MSP Act is consistent with their common practice and course of conduct of failing to: (1) pay first and/or (2) reimburse MAOs for conditional payments.

## ARGUMENT

As further demonstrated below, Plaintiff satisfies each of the elements of Rule 23. Numerosity under Rule 23(a)(1) plainly exists as to both classes, because there are hundreds of class members and thousands of claims at issue, such that individual joinder is impracticable.[3]

---

[3] *See* Regard Report, ¶¶ 141-143 ("Based on testimony, and statistics provided to me by counsel, I expect the number of Tower Hill records that need to be collected to be in the range of 10,000-20,000. If so, then this amount of data is typically very easy to transfer, and handle. Further, I expect the number of MAO enrollees with third party bodily injury claims submitted to Tower Hill

Typicality under Rule 23(a)(3) and commonality under Rule 23(a)(2) also plainly exist as to both classes because each class member's claims arise out of a common practice and are based on the same legal theory. To prove their individual claims, each class member would have to satisfy the same legal elements by relying on the same body of common evidence.

Plaintiff also satisfies the predominance and superiority requirements of Rule 23(b)(3). There are three core, disputed issues as to each class member's claims for the Settlement Class. First, were Defendants primary payers? Second, did Defendants fail to provide primary payment or fail to reimburse accident-related payments advanced by MAOs? Third, did Defendants' violation of the MSP Act cause damages? *W. Heritage Ins. Co.*, 832 F.3d at 1239. The very process used to establish these three elements for Plaintiff's numerous claims can be used to prove *any* class member's claims. It will be done as follows. *See* Deposition Transcript of Christopher Miranda ("Christopher Miranda Depo"), at  124:16 – 127:13; *see also* Declaration of Christopher Miranda, ECF No. 58-1, at ¶¶ 13-18.

*Defendants were primary payers*. Plaintiff will prove this common question with common evidence based on Defendants' settlements with Medicare beneficiaries whose accident-related medical expenses were paid by MAOs. Entry into such settlements render Defendants primary payers as a matter of law.

*Defendants failed to provide primary payment or appropriate reimbursement*.  Plaintiff will prove this common question with proof of two things. First, Plaintiff will prove that MAOs made payments for accident-related medical expenses based on the records of those MAOs.

---

to be in the range of 800 – 1,400. If so, then this amount of data matches would be very easy to further evaluate within the proposed methodology.").

Second, Plaintiff will prove that Defendants failed to pay first and/or failed to reimburse MAOs based on Defendants' record of payments, which it stores electronically as a matter of standard business practice.

*Plaintiff and the Class Members were damaged*.  As described below and herein, a method to compute damages on a class-wide basis is not a precondition to certification. The precedent is well settled in the Eleventh Circuit, along with its sister circuits, that "individual damage calculations do not preclude class certification." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016); *Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 936 (11th Cir. 2016); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374–75 (3d Cir. 2015); *accord* 4 NEWBERG ON CLASS ACTIONS § 4:54 at 210 (5th ed.) ("[O]utside of the personal injury/mass tort context, cases in which individual damage concerns predominate and defeat certification 'rarely, if ever, come along.'"). Nevertheless, Plaintiff proposes a methodology to compute damages on a class-wide basis the proposed methodology.

This action is the very paradigm for class treatment.  It involves: (1) a defendant that has systematically failed to reimburse conditional payments by MAOs; (2) three common, class-wide liability questions that are subject to common, class-wide proof; (3) a system in place to present that class-wide proof at trial; and (4) a system in place to present class-wide proof as to what Defendants owe and mechanically compute each Class Member's damages (assuming the Court accepts that Defendants can belatedly challenge payments made by MAOs).

## OVERVIEW OF COMMON EVIDENCE

Throughout discovery in this case, Defendants have thwarted numerous efforts by Plaintiff to obtain relevant information.  Despite such efforts, the evidence deduced to date establishes that class-wide issues predominate over individual questions.

### A.    Defendants' Insurance Business

Defendants are subsidiaries of Tower Hill Insurance Group, LLC, which along with its subsidiaries comprises one of the largest property insurers in Florida.[4] TH Prime issues commercial and residential homeowner's insurance policies providing first-party coverage along with third-party liability coverage, which include bodily injury claims. *See* Bob Jaye Depo, at 18:13-25, 19:1.[5] The policies include medical payments coverage, known as "Med Pay." *Id.* at 19:25, 20:1-4.  The purpose of both policies is to pay for medical expenses caused by accidents in their insured's property.

TH Claims is the third-party claims administrator for claims against policyholders insured by a Tower Hill company. *Id.* at 22:12-20. As third-party administrator, TH Claims' duties include the investigation, negotiation, and settling of claims. *Id.* at 22:22-25.

### B.    Defendants' System for Processing Claims

As a large property insurer in Florida, Defendants have two main claims management software system for the storage of basic claimant-specific data: Innovation and Citadel. Defendants use Innovation for commercial insurance and Citadel for personal insurance. *Id.* at 50:16-18. When an injury claim is made, Defendants' adjusters fill in specific fields with the claimant's demographic information, including first and last name, date of birth, gender, and social security

---

[4] https://www.thig.com/about-tower-hill/, last visited May 25, 2020.

number, in either Innovation and Citadel. *Id.* at  50:23-35, 63:3-9. These data elements are already required by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("Section 111") and are stored in formats that are compliant with industry standard electronic claim data. *See* Arrigo Report, at  7, 60-61.

**C.     Defendants' Failure to Identify and Repay MAOs and Plaintiff's System for Uncovering Reimbursable Payments**

Insurers have been able to keep secret their non-compliance with the MSP Act because MAOs are not in the best position to identify the reimbursements they are owed. Congress, and the Secretary of Health and Human Services (who is charged with administering the MSP Act), "have repeatedly flagged Medicare's inability to ascertain the existence of alternative sources of coverage as a weakness in the secondary payer program."  *United States v. Baxter Intern., Inc.*, 345 F.3d 866, 901 (11th Cir. 2003). "In light of this well-recognized weakness, it is therefore reasonable for the agency to interpret the MSP Act, and Congress' subsequent revisions of it, as imposing the risk of loss on the alternative payer for failing to determine whether Medicare has already paid for the same service." *Id*. Indeed, "Medicare's prior payment will normally be a matter of ascertainable fact" for insurers like Defendants to identify. *Id*.

However, Defendants readily admit that it has no system in place to identify payments made by MAOs. *See* Bob Jaye Depo, at 69:11-18. Instead, Defendants simply remain silent, do nothing to alert MAOs of their rights, and even when this lawsuit was filed, continued to do nothing to make reimbursements it has owed for years. *Id.* at 71:7-17. That is where Plaintiff comes in.

Through assignments, Plaintiff has obtained claims data, centralized that data, and matched it with certain databases to discover secondary payments that Defendants are required to reimburse. Plaintiff's system captures data from different sources, including original source data from the MAO assignors, such as a beneficiary name and the amounts billed/paid, as well as data from outside sources, such as crash reports and CMS. Plaintiff then normalizes and map the data to ensure consistency. In this case, Plaintiff's system has identified at least one instance where Defendants reported to CMS that they were primary payers, but failed to repay Plaintiff's assignors. One instance is more than sufficient to bring this class claim.

## CLASS CERTIFICATION STANDARD

"Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Barnard*, 452 U.S. 89, 99 (1981). Class actions aim to "achieve economies of time, effort, and expense." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).The decision to certify a class "is within the broad discretion of the district court." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004).

To certify a class, "the putative class must meet each of the four requirements specified in Rule 23(a), as well as at least one of the three requirements set forth in Rule 23(b)." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1282 (11th Cir. 2011). Thus, "every putative class first must satisfy the prerequisites of 'numerosity, commonality, typicality, and adequacy of representation.'" *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). Rule 23(a) is satisfied where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. The movant must also show that

certification is appropriate under one of the three requirements of Rule 23(b). *See Fitzpatrick*, 635 F.3d at 1282. Here, certification is appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. 23(b)(3).

The Court will conduct a "rigorous analysis" of the Rule 23 requirements, and it may be necessary for the "court to probe behind the pleadings before coming to rest on the certification question[.]" *Carrioulo*, 823 F.3d at 981. But the court should not conduct a mini-trial on the merits. *Amgen*, 133 S. Ct. at 1201. Because class certification is a procedural inquiry, a court may only address merits questions to the extent they are relevant to class certification and should not assess any aspect of the merits unrelated to a Rule 23 requirement. *See Reese v. Miami-Dade Cnty.*, 209 F.R.D. 231, 232 (S.D. Fla. 2002) ("Class certification is strictly a procedural matter and the merits of the claims at stake are not considered when determining the propriety of the class action vehicle"). It is important to note that when discussing various concepts such as data matching and damage calculations, Plaintiff is not held to a standard that such things *have been* done, but they *can* be done.

## THE SETTLEMENT CLASS SHOULD BE CERTIFIED

In accordance with Rule 23(b)(3), Plaintiff submits that this Court should certify the following class:

> All Medicare Advantage Organizations, First Tier, Downstream and Related entities, or their assignees, that provide benefits under Medicare Part C, in the United States of America and its territories, who made payments for a Medicare beneficiary's medical expenses where Defendant:
>
> (1)    is the primary payer by virtue of having settled a claim with a Medicare beneficiary enrolled in a Medicare Advantage plan;

(2)     settled a dispute to pay for personal injuries with a Medicare beneficiary enrolled in a Medicare Advantage plan; and

(3)     failed to reimburse Medicare Advantage Organizations, First Tier, Downstream and Related entities, or their assignees, the payments provided for medical items and services related to the claims settled by Defendant.

This class definition excludes (a) Defendants, its officers, directors, management, employees, subsidiaries, and affiliates; and (b) any judges or justices involved in this action and any members of their immediate families.

## I.     Rule 23(a) Requirements – Numerosity, Commonality, Typicality, and Adequacy

### A.     *Numerosity*:  The Class is so numerous that joinder is impracticable.

Rule 23(a)(1) requires that there be sufficient class members that "joinder of all members is impracticable." Fed. R. Civ. 23(a)(1). That requirement is satisfied here. Rule 23(a)(1) imposes a "generally low hurdle." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013). The general rule of thumb in the Eleventh Circuit is that more than forty class members is adequate to meet the numerosity requirement. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Plaintiff "need not show the precise number of members in the class." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983).

Numerosity is satisfied. The Settlement Class is comprised of hundreds of MAOs. Specifically, just the number of directly contracted with CMS MAOs is found on the CMS website which currently lists the total number of MAOs as totaling 818.[6] Accordingly, it would be impracticable to join all members and claims of the proposed class. In fact, as of 2018, more than 20 million Americans, comprising 34% of Medicare beneficiaries, were enrolled in a Medicare Advantage Organization. *See* Gretchen Jacobson, A Dozen Facts About Medicare Advantage,

---

[6]https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/MA-Plan-Directory, last accessed May 26, 2020.

Kaiser Family Foundation (Nov. 13, 2018), https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advantage (last visited May 26, 2020). Thus, even though it is impossible to know the exact size of the class, "common sense is sufficient to determine that numerosity has been amply proven" *Welch v. Theodorides-Bustle*, 273 F.R.D. 692, 695 (N.D. Fla. 2010). Accordingly, it is impracticable to join all members and claims of the proposed class.

**B.** **_Commonality_: Common questions of law and fact can be answered with common evidence.**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. 23(a)(2). The Eleventh Circuit has described the commonality requirement as a "low hurdle." *Williams v. Mohawk Indus., Inc*., 568 F.3d 1350, 1356 (11th Cir. 2009). The inquiry is "not the raising of common questions — even in droves — but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart v. Dukes,* 131 S.Ct. 2541, 2551 (2011). Even "a single common question will do." *Id*.

Here, three common questions of law and fact apply to every claim in the class: (1) Is Defendant a primary payer? (2) Did Defendant fail to pay or reimburse a secondary payment? (3) What is the amount of damages to the Medicare Advantage Organization? Answers to these questions drive the litigation. Accordingly, commonality is present here.

Defendants may argue that commonality does not exist because each underlying unreimbursed claim presents individualized issues. However, as discussed below in connection with the predominance requirement,[7] this contention is without merit.

**C.** **_Typicality_: Plaintiff is typical of the Class because it sustained the _same_ injury arising out of the _same_ course of conduct.**

---

[7] If the Court finds that the predominance requirement is met, then commonality is also demonstrated. *See Carriuolo*, 823 F.3d at 985 ("Plaintiffs will necessarily satisfy the commonality requirement if they can show predominance…").

Here, "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. 23(a)(3). "Like commonality, the test for typicality is not demanding." *In re Checking Account Overdraft Litig*., 286 F.R.D. 645, 653 (S.D. Fla. 2012). To satisfy typicality, "there must be a sufficient nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc*., 741 F.2d 1332, 1337 (11th Cir. 1984). "Typicality, however, does not require identical claims or defenses." *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 407 (M.D. Fla. 2018). "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg*, 741 F.2d at 1337. "Where the defendant's actions impacted the named representatives in substantially the same way as other class members, typicality is satisfied." *Cooper v. Pac. Life Ins. Co*., 229 F.R.D. 245, 258 (S.D. Ga. 2005).

Here, typicality is satisfied as to both classes because Plaintiff and the class members were damaged in the same way. Plaintiff and the class members' injuries arise from the same conduct – Defendants' failure to reimburse MAOs' secondary payments after Defendants have entered into a settlement with a Medicare beneficiary and agreed to pay for the beneficiary's medical expenses.

Although there may be variations between Plaintiff and some class members concerning the details of their respective transactions for the Settlement Class, the focus of the typicality inquiry is not on the plaintiffs' behavior, but rather on the defendant's actions. *Collins v. Int'l Dairy Queen, Inc.*, 168 F.R.D. 668, 674 (M.D. Ga. 1996), *modified*, 169 F.R.D. 690 (M.D. Ga. 1997) (modifying the classes). What matters most for typicality is whether Plaintiff and the class members are incentivized in the same way. Here, Defendants failed to reimburse the class member Medicare Advantage Organizations for the conditional payments made and were damaged as a

result. Therefore, typicality is satisfied; each class member was impacted in the same way by Defendants' misconduct.

> **D.**     ***Adequacy*: Plaintiff and Plaintiff's Counsel are adequate representatives for the Class because Plaintiff and Counsel have no conflicts with the Class and will vigorously prosecute the case.**

Rule 23(a)(4) adequacy is met where the "representative parties will fairly and adequately protect the interests of the class." "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). "[A]bsent specific proof to the contrary, the adequacy of class counsel is presumed." *Diakos v. HSS Sys., LLC*, 137 F. Su 3d 1300, 1309 (S.D. Fla. 2015).

Plaintiff's counsel is adequate to represent the class. Moreover, Plaintiff is an adequate representative of the class. Defendants will not be able to point to a single conflict of interest between Plaintiff and the Class or Plaintiff's counsel and the Class, much less one that is "serious and irreconcilable." Plaintiff is an active participant in the litigation and they, along with the Class, have the same solitary interest – recover those amounts they have paid and Defendants failed to reimburse. Similarly, Plaintiff's counsel are adequate class counsel and has successfully litigated numerous class actions, multiple-party mass tort litigations and are prepared to do so again.

## II.  Rule 23(b)(3) Requirements – Predominance and Superiority

> **A.**     ***The Proposed Class Meets the Predominance Requirement***

Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. 23(b)(3). This inquiry "test[s] whether proposed classes are sufficiently cohesive to warrant adjudication by

representation." *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 623 (1997); *see also Carriuolo*, 823 F.3d at 985 (same).  In this action, Plaintiff need only show that the following elements *can be* proven by common evidence: (1) Defendants are primary payers; (2) Defendants failed to make primary payment or appropriate reimbursement; and (3) damages – Plaintiff does not need to demonstrate on the merits that Defendants violated the MSP Act - although Defendants clearly have.

        1.     <u>Defendants' Section 111 reporting alone is class-wide evidence of Defendants' liability under the MSP Act, and can be used in conjunction with Plaintiffs' and the class members' data to establish Defendants' liability and damages.</u>[8]

Section 111 added mandatory reporting requirements to insurers, like Defendants, to report their primary payer status with respect to Medicare beneficiaries who receive settlements, judgments, awards or other payment from liability insurance (including self-insurance) and no-fault insurance. 42 U.S.C. § 1395y(b)(8). These entities are known as Responsible Reporting Entities ("RRE"). *See* Regard Report, ¶ 167. The purpose of Section 111 reporting is to enable Medicare payers to pay appropriately for Medicare-covered items and services furnished to Medicare beneficiaries and seek reimbursement when appropriate. And this makes sense. RREs are in the advantageous position to know of Medicare's prior payment while Medicare and MAOs are at the mercy of the candidness of the RREs.  Section 111 reporting requirements help reconcile the superior position of the RREs. As the Eleventh Circuit noted, Medicare pays "in the dark" and "when the primary insurer later pays, Medicare's prior payment will normally be a matter of

---

[8] It is well-established that predominance exists where common questions can be answered by use of computerized software systems. *See e.g., Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) (plaintiffs' expert testified that he could "fashion a computer program that would extract from [defendant's] records" certain data that would determine defendant's class-wide liability); accord, *Boyle v. Progressive Specialty Ins. Co*., 326 F.R.D. 69, 81 (E.D. Pa. 2018).

ascertainable fact." *Baxter Int'l, Inc.*, 345 F.3d at 901.

As part of its obligation to comply with Section 111, RREs must collect the necessary reporting data which includes first name, last name, date of birth, social security number, and gender. RREs use these data elements to query the CMS database of Medicare beneficiaries to identify the Medicare eligibility of a beneficiary. *See* Section 111 NGHP User Guide, Version 5.8, Chapter IV at Chapter 3; *see also* Regard Report, ¶ 85. And, Defendants store just that. Regard Report, ¶ 84. Because Defendants do not ascertain whether a claimant is a Medicare beneficiary, Defendants' policy is to submit **all bodily injury claims** to its third-party vendor to query CMS's database. *See* Bob Jaye Depo, at 43:10-23; Regard Report, ¶ 84(f)-(h); Arrigo Report, at 46.

Plaintiff's proposed methodology that is stored, accessible, and can be aggregated and presented on a class-wide basis. *See* Regard Report, ¶¶ 42, 120-121, 133. Plaintiff is only requesting data that is kept as a common course of conduct to comport with Section 111. Plaintiff is not requesting this Court to force Defendants to create new data they do not already store. This data would then be matched with Plaintiff's data that is "different, and superior, than using myABILITY" because Plaintiff's methodology "has better [matching] techniques and the matching uses more data fields than CMS matching via myABILITY." *Id.* at ¶¶ 43,46. This process should be fairly easy to accomplish. Defendants already maintain this data. *See* Arrigo Report, 63. On the contrary, Plaintiff's experts agree Defendants can transfer and handle their data "very easily" and "is not burdensome." *See* Regard Report, ¶¶ 141, 143; Arrigo Report, 63.

After data matching, identifying instances where Defendants are primary payers would be very simple because Defendants ***already admit to liability*** when they report to CMS pursuant to Section 111. Defendants admitted it as such on the exemplar claim, D.L.:

> Q   All right. And you would agree that in D.L.'s case as it relates to her incident of March 22nd, 2012, Tower Hill was a primary payer pursuant to the MSP Act;

correct?

A Yes.

Q And as a primary payer, Tower Hill was required to reimburse D.L.'s Medicare Advantage plan for conditional payments it made on her behalf for accident related injuries; correct?

A Correct.

Q And despite that obligation and requirement, to date Tower Hill has failed to reimburse D.L.'s Medicare Advantage plan, here Florida Healthcare Plus, for conditional payments made for accident related injuries; correct?

A Again, yes.

Bob Jaye Depo. at 198:2-20 (objections omitted). This same logic can be applied to all instances where Defendants reported to CMS. *See* Bob Jaye Depo. at 37:22-25; 38:1 (admitting that Defendants are primary payers if they enter into a settlement with a Medicare beneficiary). The methodology would be simple: match Plaintiffs' data with data Defendants store for Section 111 reporting and matches would yield instances where Defendants must reimburse Plaintiff and the class members. Thus, Section 111 reporting alone conclusively establishes that Defendants are liable as a primary payers under the MSP Act and common proof would answer the first question pertinent to the class.

2.   For non-reported claims, the data in Defendants' claims management systems along with data from the Plaintiff and the class members can establish Defendants' liability.

For instances where Defendants failed to report to CMS, the process should be no different. The data collected by Defendants (discussed above) can be used along with data from the systems of Plaintiff (and the class members) to establish Defendants' liability on a class-wide basis. *See* Regard Report ¶ 42; Arrigo Report, 60.

19

Like Defendants, Plaintiff has data in their "MSP System" that includes the same demographic information regarding Medicare enrollees that Defendants maintain in their systems regarding Defendants' claimants (i.e., name, date of birth, social security number, etc.). *See* Regard Report, ¶¶ 30, 37. The MSP System also includes additional data regarding the medical expenses paid by Plaintiffs' assignor Medicare Advantage Organizations, including the standardized coding for the medical treatment or service provided and the dates of such treatment or service. *Id.* at ¶ 46. Plaintiff can also standardize the Class Member's data to match it with Defendant's data. *Id.* at 151; Arrigo Report, 60. The data in the MSP System comes from, among other sources, Plaintiff's MAO assignors, ISO and CMS. *See* Regard Report, ¶ 149.

For its side, Defendants have: (1) the claims data submitted by its insureds (e.g., date of accident); (2) the claimant's demographic information which Plaintiffs can use to determine whether the claimant is a Medicare enrollee; (3) the claimant's address; (4) policy data (i.e., dates of coverage, policy limits, etc...); (5) payment data regarding what medical expenses, if any, Defendants paid and/or reimbursed to the Medicare Advantage Organizations and the standardized coding that identifies the specific treatment provided in connection with the expense. *See* Bob Jaye Depo, 50:23-35, 63:3-9, 103:1-6.  In other words, Plaintiff, the putative class members and Defendants together possess sufficient data to identify which of Defendants' claimants are Medicare enrollees (thus establishing Defendants' primary payer status), whether the MAOs paid medical expenses for those enrollees, and whether Defendants reimbursed the MAOs for those expenses (thereby establishing damages, as further discussed below).

The reported and non-reported cases are not too different. The one difference is that Defendants admit their primary payer status in reported cases. However, this does not mean that Defendants are off the hook when they do not report. Regardless of whether Defendants expressly

admitted liability or not liability under the MSP Act is simple. For the settlement class, if Defendants entered into a settlement and failed to reimburse Plaintiff or the class members for medical expenses paid on behalf of a Medicare beneficiary, Defendants are the primary payers. This is because "Medicare's reimbursement rights are automatic[.]" *Porter v. Farmers Ins. Co.*, No. 10-CV-116-GKF-PJC, 2012 WL 256014, at *19 (N.D. Okla. Jan. 27, 2012), *aff'd*, 505 F.App'x 787 (10th Cir. 2012); *MSP Recovery Claims, Series LLC. v. Progressive Corp.*, No. 1:18CV2273, 2019 WL 5448356, at *14 (N.D. Ohio Sept. 17, 2019).

As such, common proof will be able to determine whether Defendants were a primary payer, whether they must reimburse Plaintiff and class members, and damages. *See* Regard Report, ¶ 172.  Mr. Regard opines that common proof already exists and proving class-wide liability can be done by matching data from Defendants' system with data from Plaintiff's system and the systems of the class members. Through this method, Plaintiff will be able to answer the common questions determinative of Defendants' liability. *Id.*

### 3.    Common issues also will predominate in proof of damages.

In *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), the Court held that demonstrating predominance on class certification requires a plaintiff to show that "damages are capable of measurement on a class-wide basis." The Court stated that "[c]alculations need not be exact, but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case…"  *Id.*  However, even if present, "individualized damages calculations do not preclude class certification." *Carriuolo*, 823 F.3d at 988 (citing *Comcast* decision). Indeed, the Eleventh Circuit considers it "black letter rule." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016).  Thus, to satisfy Rule 23(b)(3)'s predominance requirement, Plaintiff must present a "a model to support[] a plaintiff's damages…

consistent its liability." *Carriuolo*, 823 F.3d at 988.

Here, Plaintiff relies on the necessary data collected and maintained by health insurers and general liability insurers, like Defendants, to conduct their business on a daily basis to prove damages on a class-wide basis.  Both systems have the necessary data to compile the amounts of secondary payments that Plaintiff and the class members made on behalf their enrollees. *See* Bob Jaye Depo, 62:11-21. This includes the retention of the same demographic information (e.g., name, address, date of birth, SSN) and ICD-9 and ICD-10 codes, which allows the parties to match the data that corresponds to the enrollee. Bob Jaye Depo at  50:23-35, 63:3-9; 90:4-17.  On its end, Defendants also have data that will show whether it reimbursed these expenses, or not. If the Defendants reimbursed Plaintiff or the class members, there is no damage and, therefore, no claim. If Defendants did not reimburse Plaintiff's assignors or the putative class member MAOs, the "actual" damages is the amount of the medical expenses paid by Plaintiff and the MAOs. As Mr. Regard states:

> Based on the review of the information and testimony produced about [Defendants'] systems and the data they manage; Plaintiff's systems and the data they manage; CMS systems and the data they managed and Class Member data; and other information discussed above, I have the opinion that the common data *exists*; that it is *easily accessible, and can be aggregated and presented on a class wide basis*; and that **the method proposed by the Plaintiff** *may be universally applied* **for all Class Members to identify liability and calculate damages**.

Regard Report, ¶ 172 (emphasis added).

### B.    *The Proposed Class Meets the Superiority Requirement*

Rule 23(b)(3) evaluates whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. 23(b)(3). The superiority inquiry focuses on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs" and "on the efficiency and economy

elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Navelski v. Int'l Paper Co.*, 244 F. Su 3d 1275, 1310 (N.D. Fla. 2017) (citing *Klay*, 382 F.3d at 1269); *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1190 (9th Cir. 2001). Factors considered in assessing superiority include (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by other members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. The facts of this case demonstrate that class certification is far superior to any other available method of adjudication for a number of reasons.

*First*, any interest in proceeding individually is not economically feasible, given that litigation costs likely could exceed the potential recovery for most of the class members. *See Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 676 (S.D. Fla. 1997) (considering "[c]lass actions [] particularly appropriate, where, as here, multiple lawsuits would not be justified because of the small amount of money sought by the individual plaintiffs"). It makes little economic sense for an MAO to pursue a lawsuit on an individual conditional payment. Even if a class member sought to bring suit on multiple claims, this litigation requires a multi-million-dollar commitment of attorney time and resources, with considerable investments for experts, court reporters, travel, and data and document review, among other things. *See, e.g., Klay,* 382 F.3d at 1271 (stating that an economic consideration to a superiority inquiry also applies to attorneys working on a contingency fee because "defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their

23

opponents in paperwork and filings"). Therefore, a class action is the most efficient means to pursue relief for class members.

*Second*, without a system for identifying the claims that Defendants have failed to pay under the MSP Act, such as the proprietary system Plaintiff has developed over a number of years and after very substantial cost, it would be nearly impossible for class members to recover their long-overdue reimbursements of secondary payments. This is the direct result of Defendants' failure to discharge its identification and reimbursement duties to MAOs. Implementing a system for the class-wide resolution of claims will allow for an economically feasible and orderly administration of thousands (if not more) of conditional payments that MAOs would not have known about but for this case. Thus, class treatment is both superior and preferable in this case, which seeks to further the intent of Congress to decrease the costs of the Medicare program. If MAOs can save money by efficiently recovering payments owed to them, the overall costs of the Medicare program necessarily decrease, which is the reason why Congress created MAOs in the first place. *See In re Avandia Marketing*, 685 F.3d 353, 365 (3d Cir. 2012) ("when MAOs spend less on providing coverage for their enrollees, as they will if they recover efficiently from primary payers, the Medicare Trust Fund does achieve cost savings").

*Third*, individual joinder of class members is impracticable, and the filing of individual lawsuits that would overwhelm the judicial system. *See Carriuolo*, 823 F.3d at 989 ("Because common questions of law and fact predominate, class-wide adjudication appropriately conserves judicial resources and advances society's interests in judicial efficiency."); *see also Leszczynski*, 176 F.R.D. at 675 (considering the overburdening of the crowding of the docket in the district with a multiplicity of separate lawsuits when discussing the superiority requirement). Moreover, if Plaintiff and class members were required to individually litigate these claims, it would necessarily

result in "less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1023 (9th Cir. 1998). Thus, a class action is the superior method for managing litigation since no realistic alternative exits.

*Finally*, there are no "likely difficulties" in managing the proposed class action. Any speculative "difficulties" Defendants may attempt to advance pale in comparison to the difficulties presented by requiring individual adjudication of each class member's claims.

## III.   Notice Requirements and Class Administration

The number of class members with a right to reimbursement under the MSP Act is far too high to support individual joinder, but providing reasonable notice to the Class is a straightforward, simple process. For MAOs that directly contract with CMS, CMS maintains a list including addresses and e-mail addresses of points of contact for these hundreds of names. A simple letter and e-mailing campaign would suffice. Further, Plaintiff has contact information for many putative class members whose contact information is not publicly available. For those whose contact information is not publicly available and not possessed by Plaintiff, notice by publication in newspapers, trade journals, and websites would be legally sufficient. Notice here is far less complex than in most consumer class actions, where millions of people might be class members.

After a class is certified, its administration will be straightforward, and Plaintiff has already proposed a solution.  A third-party vendor can employ the same normalization and mapping principles as the MSP and Defendants' systems.  Absent class members will submit their data and a matching will take place. Plaintiff's expert explains:

> Based on my experience in normalizing data, my understanding of the similar nature of data from the various MA plans, who are in similar lines of business, it is my opinion that the MSP System can be adapted to map data from other putative class members.

Regard Report, ¶ 160.

25

## CONCLUSION

The law and facts support class certification. Plaintiff has satisfied the requirements of Rule 23(a) as well as the predominance and superiority requirements of Rule 23(b)(3). Accordingly, Plaintiff respectfully requests that the Court certify the proposed Class pursuant to Fed. R. Civ. 23, appoint Plaintiffs as the class representative, and appoint Plaintiff's Counsel as class counsel to represent the interests of the Class.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to N.D. Fla. L.R. 7.1(B), I hereby certify that undersigned counsel for the Plaintiff has conferred with counsel for the Defendants and said counsel objects to the Plaintiff's Motion.

## REQUEST FOR ORAL ARGUMENT

Pursuant to N.D. Fla. L.R. 7.1(K), Plaintiff hereby respectfully requests oral argument on this matter. Plaintiff requests a full day for oral argument.

## CERTIFICATE OF WORD COUNT

I certify that this Memorandum complies with the word count limitation set forth in Local Rule 7.1(F) because this Motion contains 7,785 words, excluding the parts exempted by said Local Rule.

Dated: May 26, 2020                    Respectfully submitted,

*Attorneys for Plaintiff, MSPA CLAIMS 1, LLC, a Florida limited liability company*

*/s/ Janpaul Portal*
James L. Ferraro, Esq.
Florida Bar No.: 381659
Janpaul Portal, Esq.
Florida Bar No.: 0567264
James L. Ferraro, Jr., Esq.
Florida Bar No.: 107494
**THE FERRARO LAW FIRM, P.A.**
Brickell World Plaza

26

600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222
Email: jlf@ferrarolaw.com
          jpp@ferrarolaw.com
          jjr@ferrarolaw.com

**AND**

Louise R. Caro, Esq.
Florida Bar No.: 633380
**NAPOLI SHKOLNIK PLLC**
2665 South Bayshore Drive, Suite 220
Coconut Grove, Florida 33133
Telephone (786) 837-5442
Facsimile (786) 800-3901
Email: lcaro@napolilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2020, I electronically filed the foregoing document with the Clerk for the United States District Court, Northern District of Florida.  The electronic case filing system (CM/ECF) will send a Notice of Electronic Filing (NEF) to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Janpaul Portal*
Janpaul Portal, Esq.