UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MSPA CLAIMS 1, LLC, a Florida
limited liability company,

       Plaintiff,

vs.                                 CASE NO.:  1:18-cv-00157

TOWER HILL PRIME INSURANCE
COMPANY, a Florida profit corporation;
TOWER HILL CLAIMS SERVICES, LLC,
Florida limited liability company,

       Defendants.

_____/

**DEFENDANTS' MOTION TO STRIKE REPORTS, DECLARATIONS,
AND TESTIMONY OF PLAINTIFF'S EXPERTS**

Defendants, Tower Hill Prime Insurance Company and Tower Hill Claim

Services, LLC (hereinafter collectively "Tower Hill") move to strike the expert

reports, declarations, and purported expert witness testimony of Daniel Regard and

Michael Arrigo to the extent such opinions are used in support of Plaintiff's

Motion for Class Certification. [D.E. 62].

## I. **ARGUMENT**

"The admission of expert evidence is governed by Federal Rule of Evidence

702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d

1286, 1291 (11th Cir. 2005) (citing *Daubert v. Merrill Dow Pharm. Inc.*, 509 U.S.

579 (1993)). "Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Id.* "District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Id.* (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). "To fulfil their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Id*. at 1291-92 (citation and internal quotation omitted). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id*. at 1292 (citing *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

"In ascertaining reliability under the second *Daubert* prong [courts] have identified several factors which can be considered: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate

of error; (4) whether the technique is generally accepted by the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd*., 326 F.3d 1333, 1341 (11th Cir. 2003)). "This list of factors, however, 'do[es] not exhaust the universe of considerations that may bear on ... reliability.'" Id. (citing *Quiet Tech*., 326 F.3d at 1341; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *Daubert*, 509 U.S. at 594). And when an expert's report or testimony is critical to class certification, a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion. *Gazzara v. Pulte Home Corp*., No. 616CV657ORL31TBS, 2017 WL 953926, at *2 (M.D. Fla. Mar. 10, 2017), *reconsideration denied*, No. 616CV657ORL31TBS, 2017 WL 4863906 (M.D. Fla. Apr. 17, 2017).

Applying the above factors, the Eleventh Circuit affirmed the district court's exclusion of the putative class representatives' proposed expert in a products liability and toxic trespass case, finding the district court properly rejected the witness' flawed methodology. *Rink*, 400 F.3d at 1292-93. The purported expert's approach "required the kind of scientifically unsupported 'leap of faith' which is condemned by *Daubert*." *Id.* at 1292. In addition, the "methods were not tested, subjected to peer review, or generally accepted in the scientific community. Finally, the district court criticized Matson's method of continuing to use data in subsequent reports which was previously found to be unreliable. The record thus

3

reflects that the district court properly rejected Matson on the basis of his flawed methodology." *Id.* at 1293. *See also Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (same principle).

Similarly, in *Gazzara*, the court excluded the putative class plaintiffs' proposed expert testimony, which sought to establish classwide liability and damages in a construction defect case. This was so because there was no "justification for assuming that every house (or any house) in the class will require the extensive scope of work dictated by" the proposed methodology, and it was "mere speculation" that the homes would have the type of damage alleged by plaintiffs. 2017 WL 953926, at *3-4 (further stating "Randazzo's testimony will not help the trier of fact. . . . The issue for trial would be the reasonable cost to repair the stucco damage at each class member's home, not what Randazzo would charge to accomplish Miller's unsupported dictate class-wide," which is all Randazzo posited).

The court struck the proposed expert testimony of another putative class expert witness in the same case, explaining:

> Even if Miller's causation theory had adequate support, it would not be suited to a class action, particularly one of this (potential) magnitude. Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. . . . But Miller's causation theory—that it is more likely than not that the cracks in any class member's home resulted from one of the

4

> specified violations—only applies in terms of a single
> home, not a group of homes.  To put it in different terms,
> Miller is not asserting that the cracks in every home were
> caused by the Code violations in a single home.  Each
> home must be considered individually.

*Gazzara v. Pulte Home Corp.*, No. 616CV657ORL31TBS, 2017 WL 840953, at \*9

(M.D. Fla. Mar. 3, 2017).  *See also Moore v. GNC, Holdings, Inc.*, No. 12-61703-

CIV, 2014 WL 12684287, at \*4 (S.D. Fla. Jan. 24, 2014) (striking the class

plaintiffs' proposed witness testimony regarding the health risks of creatine, which

was included in one of defendant's products, where the report "contains no details

that would allow one to refer to the relevant studies, research, or sources in order to

check, test, affirm, or rebut Dr. Blumenkrantz's factual assertions and ultimate

conclusions.  In sum, there is no way to test Dr. Blumenkrantz's methodology, nor

is there any basis for the Court to conclude that the methodology is reliable.");

*Henkle v. Cumberland Farms, Inc.*, No. 16-14248-CV, 2017 WL 5635398, at \*1-2

(S.D. Fla. June 20, 2017) (granting motion to exclude expert testimony because

expert's opinion was not reliable).

Based on the above principles, the testimony of Plaintiff's purported class

expert witnesses, Daniel Regard and Michael Arrigo, should be excluded.

A. **Daniel Regard's Purported Expert Report and "Methodology" Is Unreliable and Unhelpful.**

Plaintiff has submitted the Declaration and Report of Daniel Regard, who maintains Plaintiff has a computer program that can determine whether any given class member has claims against Tower Hill. [D.E. 66]. Yet, Mr. Regard's method and opinion amount to nothing more than his speculation that (1) he will be able to gather the data he needs from various different sources; and (2) only after he gets the data will he (or Plaintiff) be able to develop an as yet nonexistent program that will allow the data to be matched, even though he has not seen or analyzed the data and can only speculate as to its reliability, verifiability, and compatibility.

Specifically, Mr. Regard concludes "[b]ased on the review of the information and testimony produced on Defendant's systems and the data they manage; Plaintiff's systems and the data they manage; CMS systems and the data they manage and Class Member data; I have the opinion that the data to execute the Proposed Method _exists_; that it is _easily accessible, and can be aggregated and presented on a class wide basis_; and that the method proposed by the Plaintiff _may be universally applied_ for all Class Members to identify liability and calculate damages." [D.E. 66, ¶ 8 (emphasis in original)].  But Mr. Regard fails to explain how this can possibly be done or what the actual methodology might be.  Rather, he devotes the bulk of his report to describing his understanding of what the

separate systems of Plaintiff, CMS, Tower Hill, third-party administrators and absent class members might be able to accomplish.

For example, Mr. Regard says the CMS system is one of two existing methods of which he knows that can identify unreimbursed conditional payments, the other being "one designed and used" by Plaintiffs, which he calls the "pre-Litigation Method." [*Id.* at ¶ 18]. Mr. Regard then describes, quoting snippets from CMS's website, his understanding of how CMS's system works, and the types of information CMS gathers. [*Id.* at pp. 13-15]. Mr. Regard concludes, without explaining why or how, that it is "my opinion that the method identified by the Plaintiffs relies on the same or similar data as an alternative method of identifying and collecting conditional payments implemented by CMS." [*Id.* at ¶ 4]. In other words, Mr. Regard reasons that just because the government's system works as he understands it, Plaintiff's proposed system should work too.

Mr. Regard then goes on to describe the other existing "method," Plaintiff's in-house "Pre-Litigation Method." [*Id.* at pp. 16-17]. According to Mr. Regard, "The MSP System [or Pre-Litigation Method] was designed by MSP Recovery to collect, process, and analyze relevant data including "*raw data and reports related to Medicare beneficiaries such as those involved in the present case.*'"[*Id.* at ¶ 26 (emphasis in original)]. Mr. Regard states "[u]sing the myABILITY database, MSP Recovery can identify instances where primary plans, like Tower Hill, reported

their primary payer responsibility under the Medicare Secondary Payer Act [ ] and match those instances to accident related medical expenses for which the MSP Recovery Entities' assignors made payments and were not reimbursed." [*Id.* at ¶ 29 (emphasis removed from original)].

Yet, as Mr. Regard's report concedes, neither of these existing systems will actually be used. Rather, Mr. Regard goes on to describe a non-existent "Proposed System," which he begins by describing based not on any objectively documented or tested information or data, but instead by quoting from the self-serving description of that system alleged in Plaintiff's Complaint. [*Id.* at pp. 18-20].

Then, Mr. Regard goes on to admit that this proposed data matching cannot be done without access to the class members' data. [*Id.* at ¶¶ 37-38]. Mr. Regard then describes his understanding and assumptions about information he believes is available from Tower Hill and its third-party administrators' systems. [*Id.* at pp. 33-53].

There are several fatal flaws with Mr. Regard's purported expert report. Notably absent from Mr. Regard's declaration or report is any averment or reference whatsoever to this proposed methodology for data matching being tested or testable, peer reviewed, or otherwise reliable in any way, shape or form. It is not even an existing method, but a "Proposed Method" that Mr. Regard only speculates should be workable. His imprimatur on this MSP System without

knowing how it will work is not sufficient. Not once in Mr. Regard's lengthy report does he point to or offer any testing of the model for reliability or accuracy, or any peer reviews or independent assessments of reliability. He does not describe the "method" other than in general terms, explain how it works, or say precisely what it will measure.

In fact, Mr. Regard testified that his opinion goes to the "availability of data and the data's availability to identify which enrollee members and which claims related to those members, and ultimately which MAOs those claims pertain to, not the legal ascertainability [of any claim]." [D.E. 77, 38:25-39:12]. He further testified that it was his "understanding" that "MSP is taking the position that once these calculations are completed, that will allow them to identify liability to calculate the damages that they are seeking. My focus is on the universal applicability of their method." [*Id.* at 40:11-22]. Mr. Regard made clear that he is "not opining that the method will prove liability, but if the method proves liability, I am opining that I can apply that method to all of the records." [*Id.* at 40:24-41:8].

The sum and substance of Mr. Regard's conclusory report is that data is out there, and it can be collected and presented, based on an improper "leap of faith" that Mr. Regard has taken and asks the parties and the Court to take. And, once this data is collected, he believes the Plaintiff, through its own method, can calculate liability and damages on a classwide basis. But, there is simply no way to

test or check Mr. Regard's assertions and conclusions.  This is precisely the type of unreliable purported expert testimony rejected by the courts.  *See, e.g., Rink*, 400 F.3d at 1292–93 (rejecting purported expert's testimony as the "kind of scientifically unsupported 'leap of faith' which is condemned by *Daubert*," where, as here, the proposed methods of "data transposition and temperature extrapolation" were not "tested, subjected to peer review, or generally accepted in the scientific community."); *Moore*, 2014 WL 12684287, at *4 (striking class plaintiffs' proposed expert witness testimony where, as here, his "Report contains no details that would allow one to refer to the relevant studies, research, or sources in order to check, test, affirm, or rebut Dr. Blumenkrantz's factual assertions and ultimate conclusions. In sum, there is no way to test Dr. Blumenkrantz's methodology, nor is there any basis for the Court to conclude that the methodology is reliable.").  For this reason alone, the Court should strike Mr. Regard's testimony.

Moreover, Mr. Regard admits that Plaintiff needs to gather and access information from absent class member MAOs and CMS for the proposed system to work, but he provides no explanation or other detail about how this will be accomplished or whether absent class members will even be willing to provide any such information.  Nor does Mr. Regard explain how, even if Plaintiff had access to such data, Plaintiff's "data matching" proposal will prove anything.

10

In sum, Mr. Regard's report sets forth no concrete or existing methodology for Plaintiff's "data matching" proposal – only a speculative assertion that one will be developed once he (or Plaintiff) obtains data he admittedly does not have and may not receive. As in the above cases, this type of expert "promise," containing no detailed, reliable, peer reviewed methodology or tested practice, is unreliable and should be excluded on that ground.

Nor is there anything about Plaintiff's "Proposed Method" about which Mr. Regard opines that would be helpful to the trier of fact. Mr. Regard does not explain how the various individual factors that riddle Plaintiff's case can be taken into account in his as yet undeveloped model. For example, as set forth in detail in Tower Hill's class certification opposition brief, there are many reasons Tower Hill may have no liability for a particular claim, including: (a) the lack of a valid assignment from an MAO; (b) failure to demonstrate the subject medical bills were reasonable, necessary or accident-related; or (c) exhaustion of policy limits on a particular claim. These are just a few examples, but depending on the existence of these types of facts for each individual claim, Tower Hill would have no liability for that claim.  Mr. Regard's "Proposed Method" impermissibly assumes these types of factors away as part of his unsupported proclamation that given the availability of data from various sources, Plaintiff can construct a class-wide liability or damages model. *See, e.g., Gazzara*, 2017 WL 953926, at *3-4 (rejecting

proposed expert testimony in class certification context where it would not help the trier of fact since it did not take into account the fact that not all properties in the class would have the same damage or harm).

The Supreme Court's decision in *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338 (2011), further justifies exclusion of Mr. Regard's purported methodology. There, the named female plaintiffs alleged that their employer's uniform corporate culture led supervisors to exercise their discretion in pay and promotions in a way that disproportionately favored men.  With respect to damages, the Court held that eligibility for backpay would entail individualized determinations since, under Title VII, an employer who establishes that it took adverse action against an employee for any reason other than discrimination cannot be ordered to pay backpay.  The Court refused to endorse "trial by formula," whereby a sample of class members would be selected, backpay for those individuals would be determined, and the numbers would be extrapolated to arrive at a lump sum recovery for the entire class.  Such projection, the Court held, would run afoul of the Rules Enabling Act, 28 U.S.C. § 2072(b), which forbids using the class-action device to "abridge, enlarge or modify any substantive right."  *Id.* at 367.

To the extent Plaintiff's proposed methodology about which Mr. Regard opines is not intended or designed to take into account the above individualized liability and damages factors, it is precisely the "trial by formula" that *Wal-Mart*

forbids.   Certification based on such an approach would deprive Tower Hill of individual defenses that would either reduce or eliminate recovery for individual class members, thereby denying Tower Hill due process. A methodology, such as the one Mr. Regard champions, created solely for the purposes of litigation, should be heavily scrutinized.  *See, e.g., Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 408 (6th Cir. 2008) ("Stein not only created his report for the purposes of litigation, but . . . he created the precise methodology at issue for that purpose as well.  We have been suspicious of methodologies created for the purpose of litigation, because expert witnesses are not necessarily always unbiased scientists."). Likewise, silence as to methodology renders expert testimony unreliable.  *See, e.g., Raiford v. National Hills Exchange, LLC*, No. 1:12-CV-152, 2016 WL 2889038, at *6 (S.D. Ga. May 17, 2016) (excluding expert testimony where expert was silent as to methodology).

Here, the proposed "methodology," if it can even be called that and if it is ever actually developed, will have been devised solely for purposes of this litigation. That further undermines any showing of reliability.  And when that methodology has not even been created and there is no indication that it can possibly be effectuated, it should be rejected for all the reasons set forth above. Accordingly, Tower Hill respectfully requests the Court to strike Mr. Regard's testimony, declaration and report in their entirety.

### B. Mr. Arrigo's Purported Expert Report is Improper and Unhelpful to Class Certification.

Plaintiff has also submitted the "expert" report of Michael Arrigo to opine on various industry standards, whether Tower Hill performed its duties as an RRE concerning the exemplar claim of D.L., and whether Plaintiff's discovery requests for production of data were reasonable. [D.E. 67 at p. 6].

Mr. Arrigo's opinions should be excluded for several reasons. First, none of his opinions offered relate to the issue of class certification and are therefore unhelpful and unnecessary. Instead, Mr. Arrigo's report seems focused on the discovery dispute that has already been decided by this Court. *See* [D.E. 61]. But a motion for class certification is an improper vehicle to seek reconsideration of a discovery order that has not otherwise been challenged.

Second, several of Mr. Arrigo's opinions are simple summaries of documents produced in discovery and depositions. But merely reviewing deposition testimony and claim files is not the proper subject of an expert report. *See, e.g., Omar v. Babcock*, 177 Fed. App'x 59, 63 n. 5 (11th Cir. 2006) ("if the jury does not need the assistance of an expert to understand the case, or if the witness simply recounts the facts and then offers an opinion as to the conclusion which the jury should reach, such expert testimony is not permitted."); *Dugas v. 3M Co.*, No. 4-CV-1096-J-39JBT, 2016 WL 7327666, at *3 (M.D. Fla. Mar. 30,

2016) (same principle; stating "Mr. McCaffery researched and reviewed Mr. Dugas's personnel records, naval records, and deposition testimony, all of which described the scope of Mr. Dugas's work.  This is problematic because UTC fails to explain why a jury could not read or listen to the testimony of Mr. Dugas, Mr. Dugas's co-workers, and the documents upon which Mr. McCaffery relied in forming his opinion as to the type of work Mr. Dugas performed and reach their own conclusions.  In other words, not only does UTC fail to explain how Mr. McCaffery is qualified to offer an opinion on the work Mr. Dugas performed, but he fails to show this opinion is outside of the understanding of the average lay person.").

Third, Mr. Arrigo's opinion as to the legal implications of Tower Hill's conduct with respect to D.L. is inappropriate. "A witness [] may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). Therefore, "the district court must take adequate steps to protect against the danger that an expert's opinion would be accepted as a legal conclusion." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018) (internal quotation marks omitted).  In particular, it is the court that determines the legal standards applicable to a case, and an expert witness's opinions on what legal standards are applicable are "outside of his competence and must be excluded." *City of*

15

*Tuscaloosa v. Hacros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998); *accord*, *e.g., Fabelo v. Wells Fargo Bank, N.A.*, Case No.: 1:13-cv-22721-UU, 2014 WL 12596986, at *5 (S.D. Fla. Nov. 19, 2014) (expert may not opine as to his or her legal interpretation of a statute, where it is exclusively the court's role to interpret relevant statutes).

Purported expert testimony which amounts to mere legal conclusions and expounding on the law is improper and should be excluded. *See., e.g., Traver v. Wells Fargo Bank, N.A.*, No. 3:14-CV-895-J-32MCR, 2016 WL 740523, at *3 (M.D. Fla. Feb. 25, 2016) (excluding expert testimony that "the affidavit testimony contains impermissible legal conclusions which invades the province of the factfinder."); *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 584 (N.D. Fla. 2009), aff'd sub nom. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) ("Evenflo seeks to exclude Whitman's opinion that it was negligent in its testing of the Discovery. . . . Because any opinion that Evenflo was negligent is clearly a legal conclusion which Whitman is not qualified to offer, this opinion will be excluded."); *Harrison v. Royal Caribbean Cruises, Ltd.*, No. 1:12-CV-24111-UU, 2013 WL 11316997, at *3 (S.D. Fla. Nov. 8, 2013) (excluding purported expert opinions that "merely recite counsel's legal and factual conclusions."). The report of Michael Arrigo consists of improper exposition of the law, including legal

16

implications of relevant statutes. [D.E. 67].  For that reason, these opinions should be stricken.

## II. <u>CONCLUSION</u>

For all the foregoing reasons, Tower Hill respectfully requests this Court to strike Plaintiff's expert reports, declarations and testimony filed in support of its Motion for Class Certification.

## <u>CERTIFICATE IN ACCORDANCE WITH LOCAL RULE 7.1(B)</u>

Undersigned counsel certifies that she has conferred with counsel for the Plaintiff and said counsel objects to the relief requested herein.

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that this Memorandum complies with the word count limitation set forth in Local Rule 7.1(F) because this Memorandum contains 3,838 words, excluding the parts exempted by said Local Rule.

Respectfully submitted,

/ s / Nicole Smith
NICOLE SMITH
Florida Bar No. 0017056
RUMBERGER, KIRK & CALDWELL
Post Office Box 10507
Tallahassee, Florida  32302-2507
Telephone:  (850) 222-6550
Telecopier:  (850) 222-8783
E-mail:   nsmith@rumberger.com

and

SAMANTHA DUKE
Florida Bar No. 0091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133
E-mail:  sduke@rumberger.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 27, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:  James L. Ferraro, Esq., at jlf@ferrarolaw.com; Janpaul Portal, Esq., at jpp@ferrarolaw.com; James L. Ferraro, Jr., Esq., at jjr@ferrarolaw.com; and Louise R. Caro at lcaro@napolilaw.com.

/ s / Nicole Smith
NICOLE SMITH
Florida Bar No. 0017056
RUMBERGER, KIRK & CALDWELL
Post Office Box 10507
Tallahassee, Florida  32302-2507
Telephone:  (850) 222-6550
Telecopier:  (850) 222-8783
E-mail:  nsmith@rumberger.com

and

18

SAMANTHA DUKE
Florida Bar No. 0091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133
E-mail:   sduke@rumberger.com

Attorneys for Defendants

13822416.v1