**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

CASE NO.: 1:18-cv-00157 AW/GRJ

MSPA CLAIMS 1, LLC,

    Plaintiff,

v.

TOWER HILL PRIME INSURANCE
COMPANY and TOWER HILL CLAIMS
SERVICE, LLC,

    Defendants.

_____/

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE
TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**INTRODUCTION**

Plaintiff proposes a Class methodology that seeks to take existing data in Defendants'[1] systems and match it with data from Medicare Advantage ("MA") plans to identify specific instances where reimbursements are warranted. These reimbursements are owed to Class Members where: (1) Tower Hill reached a settlement with a Medicare beneficiary for an accident; (2) the Medicare beneficiary incurred medical expenses related to the settlement; (3) the MA plan paid those expenses; and (4) Tower Hill did not reimburse that expense. All the data elements needed to identify these specific expenses are located in Tower Hill's Innovation and Citadel databases and the MA plans' databases. *See* ECF No. 71, at pp. 50:23-35, 63:3-9. The data should be processed and administered as part of a certified class of said MA plans (the "Class Members").

At the certification stage, plaintiffs need only show that their proposed methods for calculating damages are plausible. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004); *Negrete v. Allianz Life Ins. Co. of N. Am.,* 238 F.R.D. 482, 494-95 (C.D. Cal. 2006). Here, a mechanical application of four steps will prove each element of an MSP Act violation and clearly demarcate Tower Hill's class-wide liability. Step 1 is extraction—Tower Hill and the Class Members will extract and produce to the Class Administrator the necessary data elements. Step 2 is name matching—the Class Administrator will match the names of individuals in the respective databases that both Tower Hill and a Class Member insured. Step 3 determines if Tower Hill entered into a settlement with a Class Member. Step 4 is to take the matches and determine whether Tower Hill reimbursed the Class Members for any amounts they paid. Tower Hill should be held liable for any instances where it failed to reimburse a Class Member MA plan.

---

[1] As in the Class Certification brief, Plaintiff shall continue to refer to Tower Hill Prime Insurance Company and Tower Hill Claims Services, LLC, collectively as "Tower Hill".

In opposing this proposed methodology, Tower Hill asserts affirmative defenses that fail to undermine predominance, and cite plainly distinguishable authority in support thereof. At bottom, any purported individual issues at play here do not predominate over the common questions. Class certification is perfectly suited to this case which involves analyzing data mechanically to answer common questions.

Tower Hill's remaining makeweight arguments also lack merit. Tower Hill argues that because the fact discovery deadline has passed, Tower Hill is shielded from producing any further discovery even if this Court certifies the class. This is totally illogical and effectively seeks to use the class certification process as a sword and a shield. Surely, if Plaintiff blindly requested fact discovery for every potential class claim, Tower Hill would object on the basis that it is premature. Plaintiff does not yet know the specific putative class members that exist, and it is unreasonable to guess which documents to request until after a determination has been made on class certification.

As for numerosity, Plaintiff's expert, Dan Regard, concluded that there are hundreds, if not thousands, of Medicare beneficiaries that entered into a settlement with Tower Hill while simultaneously enrolled in an MA plan. Finally, Tower Hill argues that this Court would have to determine Plaintiff's standing to assert each claim. However, following binding authority, this Court already determined that Plaintiff has standing related to this assignment, and thus, this is a non-issue to determine certifiability.

**A. The "individualized issues" asserted by Tower Hill are insufficient to predominate over common questions.**

    1. <u>Tower Hill's relatedness defenses do not preclude class certification.</u>

The arguments asserted by Tower Hill in opposing class certification are undermined and contradicted by its own internal processes.

Tower Hill argues that to determine the relatedness[2] of any class claim it needs to conduct an extensive and individualized audit. However, Tower Hill lacks "any internal medical management team or medical management nurses that are tasked with reviewing the medical records to determin[e] relatedness and appropriateness of medical treatment." *Id*. at p. 173:8-12. And moreover, Tower Hill never conducts any independent medical examinations. *Id*. at pp. 173:23-174:2. Tower Hill's stated goal is to "resolve the claim as soon as possible." ECF No. 71, pp. 189:23-190:1. By its own admission, any relatedness review is de minimus. Therefore, Tower Hill's claim that it would need to audit all claims to determine relatedness is wholly inconsistent with its past and existing claims handling policies and procedures.

The general rule is that "[c]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 39, 55 Fed. R. Serv. 3d 253 (1st Cir. 2003) ("Instead, where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses."); *In re Checking Account Overdraft Litigation*, 286 F.R.D. 645, 656 (S.D. Fla. 2012) (rejecting argument that affirmative defenses precluded a finding of predominant common issues in case challenging bank's method of calculating overdraft fees). Specifically, unique affirmative defenses rarely predominate where a common course of conduct is established. *Checking Account Overdraft*, 286 F.R.D. at 656. As stated *supra*, Tower Hill's common course of conduct is to settle the claim as quickly as possible and bypass a claims review process to

---

[2] Although it briefly mentions reasonable and necessary defenses, Tower Hill focuses its defenses on relatedness. This is perhaps because Tower Hill understands that reasonable and necessary defenses are inapplicable when a primary plan's responsibility is demonstrated via a settlement. (holding that "***any payment that*** Medicare does make is secondary and ***is subject to reimbursement*** from sources of primary coverage under the statute." *U.S.* v. *Baxter Intern., Inc.*, 345 F.3d at 886; *Porter v. Farmers Ins. Co.*, 2012 WL 256014, at *19 (N.D. Okla. 2012) ("Medicare's reimbursement rights are automatic."). These are PIP specific defenses under the Florida Motor Vehicle No-Fault Law. § 627.736, Fla. Stat. (2020).

determine relatedness. Relatedness defenses are unique to Tower Hill as there is no evidence that Tower Hill's common course of conduct is to challenge relatedness in its claims review process. Since unique affirmative defenses rarely predominate common questions, relatedness defenses are not an impediment to class certification. Moreover, if evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has adequate procedural mechanisms available to address those circumstances. *Smilow*, 323 F.3d at 39-40. For example, a court could: (1) bifurcate liability and damage trials; (2) decertify the class after the liability trial; (3) create subclasses; or (4) alter or amend the class. *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 141 (2d Cir. 2001).

Furthermore, Tower Hill's affirmative defenses pertain primarily to the issue of damages rather than liability. If a court has to establish damages on an individual basis and liability has been established, common issues of liability predominate over the individual issues of damages. *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), ); *Visa Check,* 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues"); *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 298 (5th Cir.2001) ("Although calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"). Here, liability will have been established in every single instance where Tower Hill entered into a settlement with a Medicare beneficiary and failed to reimburse an MA plan. The only issue to determine is the amount owed to Plaintiff and the Class. The MSP Act authorizes a claim "against a primary plan that pays a judgment or settlement to a Medicare beneficiary, but fails to pay Medicare its share." *Glover v. Liggett Group, Inc.*, 459 F.3d 1304 (11th Cir. 2006) (citing § 411.24(i)). Even if the terms of the settlement absolved Tower Hill from any "determination or

4

admission of liability," the MSP Act still considers Tower Hill a primary plan. 42 U.S.C. § 1395y(b)(3)(A).

Despite the explicit terms of the statute, Tower Hill cites to *Allstate* to argue that a pre-existing settlement only establishes a "potential obligation under the MSP Act." ECF No. 78, at p. 9 (citing *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F. 3d 1351, 1361 (11th Cir. 2016). However, the holding in *Allstate* was specific to when a primary plan's responsibility was demonstrated "by other means," such as a contractual obligation in an insurance contract. Those are not the facts at issue here. Even if the settlement terms were set up for a plan to avoid liability, a plan is still considered primary upon the entry of a settlement agreement. In short, a settlement equals liability under the MSP Act. With liability already determined, the only remaining issue is damages. However, the Eleventh Circuit is clear that "individualized damages calculations do not preclude class certification." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016). And if this Court finds that they do not, Tower Hill waived its right to challenge these claims sixty days after a Medicare provider paid. *See Humana Med. Plan, Inc. v. W. Heritage, Inc.*, 832 F.3d at 1240 (noting that after an organizational determination has been issued, the reimbursement amount "is [] fixed").

### 2. *Ocean Harbor is inapposite.*

Tower Hill's reliance on *Ocean Harbor* is also misplaced. *Ocean Harbor Cas. Ins. v. MSPA Claims 1, LLC*, 261 So. 3d 637, 639 (Fla. 3d DCA 2018). The Third District Court of Appeals reversed the trial court's class certification order in *Ocean Harbor* because it found that plaintiffs had to satisfy the underlying Florida no-fault law. Once again, that is not the case here. When a plaintiff attempts to demonstrate a party's responsibility under the MSP Act by pre-existing settlements, their liability is automatic. *See Porter*, 2012 WL 256014, at *19 (N.D. Okla.

5

Jan. 27, 2012), aff'd, 505 F. App'x 787 (10th Cir. 2012) ("Medicare's reimbursement rights are automatic… [o]nce there has been a judgment or settlement, Medicare has standing to sue the insurer to obtain reimbursement."). Even the Ocean Harbor court deemed that distinction "*significant*[]." *Id.* at 639 (emphasis added). And it makes sense. Settlements are not governed by any underlying state law such as automobile no fault policies. There will be no need to delve into a series of mini-trials here because, if an insurance company entered into a settlement with a Medicare beneficiary and an existing Medicare recovery claim was left unsatisfied, then the only remaining issue is damages.

### 3. *A Section 111 report to CMS acts as admission of Tower Hill's status as a primary payer.*

Lastly, Tower Hill argues that a "report under Section 111 is not an admission of liability, but rather notification to CMS that Tower Hill may have a claim." ECF No. 87, p. 10. This is a fundamental misunderstanding of its reporting obligations pursuant to the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("Section 111").

Entities responsible for complying with Section 111 are referred to as "Responsible Reporting Entities" or "RREs." *See* Section 111 NGHP User Guide, Version 5.9, Chapter I, Chapter 2-2. Liability insurers, like Tower Hill, are considered RREs. After an RRE enters into a settlement with a Medicare beneficiary, the RRE begins its Section 111 reporting obligations. *Id.* at Chapter I, Chapter 2-2. The MMSEA Manual is explicit that the Section 111 reporting process begins only "**after** the claim is addressed/resolved." *Id.* at Chapter I, Chapter 5 (emphasis added). In other words, Tower Hill begins to submit information to CMS only **after** Tower Hill settles a claim.

Section 111 reporting obligations entail a two-step process: querying and supplementing. Step 1 is to query CMS to determine whether an injured party is a Medicare beneficiary. *Id.* at

Chapter I, Chapter 6. CMS allows RREs that are file submitters to submit a query to the BCRC[3] to determine the Medicare status of the claimant prior to submitting claim information for Section 111 reporting. *Id.* The query record must contain the claimant's Social Security Number (SSN) or Medicare ID (Health Insurance Claim Number [HICN] or Medicare Beneficiary Identifier [MBI]), name, date of birth and gender. *Id.* After the query submission, CMS will return a query response record to notify the RRE whether the claimant has been identified as a Medicare beneficiary based upon the information. If CMS notifies the RRE that the claimant is not a Medicare beneficiary, then the CMS website will reject the query and the RRE's Section 111 obligations are complete. *However*, if CMS finds that the claimant *is* a Medicare beneficiary, then CMS will accept the query and the RRE must continue to Step 2.

Step 2 entails supplementing the matched beneficiary's initial query to CMS with claim specific information. At this juncture, CMS will request the RRE to update the record with incident specific details, including the TPOC.[4] *Id.* at Chapter IV, Chapter 6.4. Once an RRE reports the TPOC, the RRE is admitting that it entered into a settlement agreement with the matched beneficiary, and thus, that it is a primary payer under the MSP Act. *Id.* An RRE cannot report its TPOC without a settlement agreement because the dollar amount of the settlement agreement gets reported to CMS. Contrary to what Tower Hill argues, this is *not* just a "notification that CMS may have a claim." **This is proof that a settlement occurred between an RRE and a Medicare beneficiary**.

---

[3] The BCRC refers to the Benefits Coordination & Recovery Center, which is responsible for the recovery of mistaken liability, no-fault, and workers' compensation claims.
[4] TPOC refers to "Total Payment Obligation to the Claimant," which is the dollar amount of the total payment obligation to, or on behalf of, the injured party in connection with the settlement.

7

In sum, Tower Hill can only begin the Section 111 reporting process **after** it settles a claim with a Medicare beneficiary, and when it does so, it must report its TPOC. Tower Hill cannot do either without a settlement agreement in place.

### B. The parties can still conduct post-certification discovery.

Tower Hill's "gotcha" litigation tactics in attempting to use the class certification process as both a sword and a shield should be rejected. Tower Hill strategically requested a thirty-day extension to file its response[5] until after the fact discovery deadline had passed to be able to turn around and argue in its response that the fact discovery cut-off shields it from having to produce further discovery in this case. However, the Court can supplement the current scheduling order "in order to allow Plaintiff to conduct such post-certification discovery as may be necessary." *Snipes v. Dollar Tree Distribution, Inc.*, No. 215CV00878MCEKJN, 2019 WL 291351, at *1 (E.D. Cal. Jan. 23, 2019); *Turgeon v. Whirlpool Corp.*, No. 2:17-CV-00473-MCE-AC, 2017 WL 2954234, at *1 (E.D. Cal. July 11, 2017) (deferring deadline for post-certification discovery "for a time when the parties have a better understanding of the case and a better sense of what merits-related discovery is needed to proceed in trial"). Tower Hill's argument is improper here because the discovery deadlines is related to discovery arising from the particular exemplar beneficiary, D.L., set forth in the Complaint. Indeed, when Plaintiff sought data matching discovery, Tower Hill argued that data matching was inappropriate because it was not proportional to the needs of the case which only involved one exemplar. ECF No. 61 (summarizing Tower Hill's current posture of the case as "a case that so far involves a single 'exemplar'"). Now, Tower Hill is effectively arguing that Plaintiff cannot take broader merits discovery if a class is certified because the fact discovery deadline has passed. ECF No. 78, p. 13. Tower Hill cannot have it both ways. It

---

[5] This provided Tower Hill **sixty days** to respond to Plaintiff's motion for class certification.

cannot use the absence of a certified class as a shield and a sword in discovery. If a class is certified by the Court, post-certification merits discovery will clearly be necessary.

To be sure, the trial court has discretionary power to expand or supplement the discovery period. "The Federal Rules of Civil Procedure strongly favor full discovery whenever possible," and the trial court "is given wide discretion in setting the limits of discovery." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). It is within the Court's discretion to modify its scheduling order should the moving party show that despite its diligence an extension of the deadlines is necessary. *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (if "the schedule cannot be met despite the diligence of the party seeking the extension" court may modify scheduling order deadlines); *Kuschner v. Nationwide Credit, Inc.*, 256 F.R.D. 684, 687 (E.D. Cal. 2009); ("Good cause may be found to exist where the moving party shows that it diligently assisted the court with creating a workable scheduling order, that it is unable to comply with the scheduling order's deadlines due to matters that could not have reasonably been foreseen at the time of the issuance of the scheduling order, and that it was diligent in seeking an amendment once it became apparent that the party could not comply with the scheduling order"); *Newell v. Wal-Mart Stores, Inc.*, 2:13-CV-00123-RJC, 2013 WL 3200107, at *4 (D. Nev. June 21, 2013) (same). If this Court should grant class certification, this Court would be well within its powers to allow the parties to conduct post-certification discovery.

### C. Plaintiff meets the numerosity threshold with ease.

Tower Hill argues that "nowhere does Plaintiff cite any record evidence indicating the number of MAOs who made a payment to a beneficiary who also settled a claim with Tower Hill." ECF No. 78 at p. 25. This is patently false. In his expert report, Mr. Regard estimated that between 800 and 1,400 MA enrollees submitted third party bodily injury claims to Tower Hill. *See* ECF

9

No. 66, at ¶ 141. This means that there were at least 800 to 1,400 instances where an MAO made conditional payments on behalf of MA enrollees for medical items and services rendered. This expert opinion went unrebutted. This evidence is more than sufficient to satisfy the threshold for numerosity.

### D. Standing is not so individualized to impede class certification.

Tower Hill argues that because "the issue of Plaintiff's standing has been heavily litigated in this case," this Court should consider this a heavily individualized inquiry. But this issue is only litigated because Tower Hill continues to raise it, not because it has any merit. The Eleventh Circuit makes this clear: MSPA's chain of assignment supports standing. *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1319 (11th Cir. 2019) ("The settlement fully resolved the MSP Act assignment dispute and confirmed La Ley's assignment of FHCP's claims to MSPA."). This Court does not need to go any further.

Further, "numerous courts have certified litigation classes in which the named plaintiffs were operating under an assignment." *In re Wellbutrin Sr Direct Purchaser Antitrust Litig.*, 2008 WL 1946848, at *4 (E.D. Pa. 2008). In fact, "[a]mple precedent exists for the proposition that assignees can be adequate class representatives." *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 53-54 (D. Mass. 2013). Even if other assignments were included as part of the class, this issue does not preclude class certification.

## CONCLUSION

The law and facts support class certification. Accordingly, Plaintiff respectfully requests that the Court certify the proposed Class pursuant to Fed. R. Civ. 23.

Dated: August 13, 2020.                              Respectfully submitted,

*Attorneys for Plaintiff, MSPA Claims 1, LLC*

10

        */s/ Janpaul Portal*
James L. Ferraro, Esq.
Florida Bar No.: 381659
Janpaul Portal, Esq.
Florida Bar No.: 0567264
James L. Ferraro, Jr., Esq.
Florida Bar No.: 107494
**THE FERRARO LAW FIRM, P.A.**
Brickell World Plaza
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222
Email: jlf@ferrarolaw.com
       jpp@ferrarolaw.com
       jjr@ferrarolaw.com

          **AND**

Louise R. Caro, Esq.
Florida Bar No.: 633380
**NAPOLI SHKOLNIK PLLC**
2665 South Bayshore Drive, Suite 220
Coconut Grove, Florida 33133
Telephone (786) 837-5442
Facsimile (786) 800-3901
Email: lcaro@napolilaw.com

## CERTIFICATE OF SERVICE

    I hereby certify that on August 13, 2020, I electronically filed the foregoing document with the Clerk for the United States District Court, Northern District of Florida. The electronic case filing system (CM/ECF) will send a Notice of Electronic Filing (NEF) to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

        */s/ Janpaul Portal*